IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

JOHNNY BANKS                                                                           PLAINTIFF

V.                              CASE NO. 4:18CV00259BSM

SHELBY HAWKINS, individually and in his official
capacity; CITY OF SHANNON HILLS                                        DEFENDANTS

**Plaintiff's Brief in Response to Defendants'
Motion for Summary Judgment**

Preliminary Statement and Summary of Facts

On February 13, 2017 at approximately 9:50 p.m., defendant (Hawkins) responded to a dispatch regarding a possible domestic violence call at plaintiff's (Banks) home in Shannon Hills, Arkansas. When Hawkins arrived, he observed a house, driveway at the back of the house and two vehicles. The emergency lights on one vehicle, a truck, were flashing. Hawkins walked around three sides of the house for several minutes after which he went to the front entry. He knocked on the door and said "police". No one answered his knock. Hawkins then walked around the house again several times. He heard noises from within which he discerned to be a woman saying: "no, no, no", see Plaintiff's Exhibit 1 – Hawkins Deposition (PX1)(Exhibit D, p. 46:10-13; p. 41:11-18; p. 47: 6-8; 53:9-16, possibly a "muffled noise," (Exhibit D, p. 46: 14-23) or a blocked noise. (Exhibit D, p. 47:1-12)

Hawkins did not decipher any other words which he attributed to anyone

1

while he was outside the residence. Nor did he perceive a physical altercation within the house. (Exhibit D, p.117:16-18) Upon Hawkins perceiving silence from within the residence, after having previously heard the "muffled" no's from within, while within an unlit 3-foot narrow corridor entry, he began kicking the door to plaintiff's residence. When the door opened, Banks did not touch or strike Hawkins. (Exhibit D, p. 93: 16-23; p.98:4-19) Hawkins shot Banks!  Hawkins now defends his action by stating that he was hit on the head by some unidentified object.  He does not assert that without the intervention of the unidentified source which struck him, (Exhibit D, p. 87) his behavior toward Banks would have differed. (Exhibit D, p. 99:20-23, p. 108:17-18) Plaintiff claims that Hawkins used excessive force upon entering plaintiff's residence when Hawkins shot Banks.  (Exhibit D, p. 70:5-23, 71, 72:2-7; p. 81:6-25; and p. 83:11-18; p. 84:22-25, p. 89:17-25; p. 90:1,  p. 121: 4-11; p. 122: 22-24)

## Standard for Motion for Summary Judgment

Summary Judgment is appropriate when, viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Wells Fargo Home Mortg., Inc. v. Lindquist, 592 F.3d 838, 842 (8th Cir. 2010)* (quoting *Hennin v Mainstreet Bank, 538 F.3d 975, 978 (8th Cir. 2008)*). In ruling on a motion for summary judgment, courts are required to draw all reasonable inferences in favor of the non-moving party, and they are not to weigh the evidence or make credibility

determinations.  *Bell v Kansas City Police Dep't., 635 F 3d. 346, 347 (8th Circ. 2011)* (citing *Nyari v. Napolitano, 562 F.3d 916, 922* (8th Cir, 2009)).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)*.  To satisfy this burden, the movant must either submit evidentiary documents that negate the existence of some material element of the non-moving party's claims or defense or, if the issue is one for which the non-moving party's claims or defense or, if the issue is one for which the non-moving party has the burden of proof at trial, merely point out that the evidentiary documents contain sufficient proof concerning an essential element of the moving party's claims. *Catrett, 477 U.S. at 325*.

The party opposing the motion must present affirmative evidence in order to defeat a properly supported motion for summary judgment.  *Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 257 (1986)*.  That party may not rest upon the mere allegations or denials of his pleadings, but in his response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial; if he does not respond, summary judgment, if appropriate, shall be entered against him. Fed. R. Civ. P. 56 ( e )(3).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  *Anderson v. Liberty*

*Lobby, Inc.* 477 U.S. 242, 247-248 (1986). The dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-248. All the evidence and inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion for summary judgment, and the court is not authorized to weigh the evidence or make credibility determinations. *Anderson, 477 U.S. at 249*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).*

1. **Officer Hawkins used excessive force when he shot Mr. Banks because Mr. Banks had not committed a crime, he was not suspected of having committed a crime, he did not pose an immediate threat to anyone, and he did not resist or evade Officer Hawkins.**

In assessing Mr. Banks's excessive force claim, this Court has to determine whether Officer Hawkins's actions were objectively reasonable in light of the facts and circumstances he faced when he encountered Mr. Banks. *Graham v. Connor*, 490 U.S. 386, 397 (1989) (citing *Scott v. United States*, 436 U.S. 128, 137-139 (1978); *Terry v. Ohio*, 391 U.S. 1, 21 (1960)). That inquiry requires careful attention to the facts and circumstances of Officer Hawkins's encounter with Mr. Banks, including whether Mr. Banks had committed a crime or was suspected of having committed one, whether Mr. Banks posed an immediate threat to the safety of Officer Hawkins or to others, and whether Mr. Banks actively resisted or attempted to evade Officer Hawkins. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

If this Court views the facts of this case in the light most favorable to Officer Hawkins, it should conclude that a jury could find that Officer Hawkins's shooting

of Mr. Banks was objectively unreasonable, and an analysis of the framework the Supreme Court of the United States established in *Graham v. Connor* proves as much. 490 U.S. 386, 396 (1989) (citing *Garner*, 471 U.S. at 8-9).

When Officer Hawkins arrived at the Banks' home, he did not immediately knock on the door to see for himself if a domestic disturbance was ongoing or whether any other of kind of emergency existed; instead, he walked around the exterior of the Banks' home for five to eight minutes, and during this time period, he did not observe anything that one could objectively describe as evidence of criminal activity or domestic violence. (Exhibit D, at 51-52, 54-56, 58, 62-68, 79-80, 85).

At the end of that five to eight-minute period of time, he knocked on the Banks' door and announced himself, but no one answered. ( Exhibit D, at 62-63, 67). And when he knocked on the door, he did not hear a sound emanate from the interior of the Banks' home, which further demonstrates that nothing was happening in the Banks' home that can be objectively described as evidence of criminal activity or domestic violence. (Exhibit D, at 68, 78, 79-80, 85, 117:9-25). At this juncture, Officer Hawkins should have left the Banks' home because he had no lawful reason to continue to be there, for whatever emergency he may have had reason to think existed when he received the 911 dispatch operator's call ceased to exist by the time he arrived at the Banks' home. *Neal v. Ficcadenti*, 895 F.3d 576, 581 (8th Cir. 2018) (an officer who responds to an emergency is not permitted to ignore changing circumstances and information that emerges once he arrives on the

scene) (citing *Ngo v. Storlie,* 495 F.3d 597, 603 (8th Cir. 2007) ("[E]ven though Storlie was responding to a severe crime—a fellow officer had been shot—a reasonable officer arriving at the scene would have recognized that Ngo did not pose an immediate threat to the officers' safety or the safety of others.")).

Officer Hawkins claims that the 911 call, the manner in which Mr. Banks's parked his vehicle, the flashing emergency lights on Mr. Banks's vehicle, and his hearing a muffled "no, no, no" sound evidenced a "life or death" situation. His own actions, however, demonstrate the speciousness of this claim. Had Officer Hawkins encountered a genuine "life or death" situation when he arrived at the Banks' home, he would not have spent five to eight minutes milling around the exterior of their home; after all, it was obvious when he arrived that nothing was going on outside that remotely resembled criminal activity or domestic violence, yet outside is where he remained for five to eight minutes before knocking on the door. (Exhibit D, at 68, 78, 79-80, 85, 117). And when he did knock on the door, he did not hear a sound from anyone or anything in the Banks' home. (Exhibit at 68, 78, 79-80, 85, 117).

Rather than leave as he should have, Officer Hawkins searched the exterior of their home a second time, and this time for two additional minutes, which brought the total amount of time that he spent outside of the Banks' home to ten minutes. (Dep. of Shelby Hawkins, at 64, 68). And at no point during this ten-minute time period did he see any evidence of a crime or of domestic violence. (Exhibit D, at 68, 78, 78-80, 85, 117).

At the end of this ten- minute time period, however, he did hear a muffled "no, no, no" sound coming from inside the Banks' home. (Exhibit D, at 68). If one gives Officer Hawkins the benefit of the doubt and assumes that a muffled "no, no, no" could be interpreted as a distress call, that still does not make it objectively reasonable for Officer Hawkins to have shot Mr. Banks because when Officer Hawkins shot Mr. Banks, Mr. Banks had not committed a crime, he was not suspected of having committed a crime, and Officer Hawkins did not observe him commit a crime. (Exhibit D, at 85, 117; Exhibit E, at 54).

Moreover, Mr. Banks did not threaten Officer Hawkins or anybody else, nor did he attempt to resist or evade Officer Hawkins. (Exhibit B, at 40-42, 45-47; Exhibit D, at 40-41). All Mr. Banks did was answer the door and immediately upon doing so, Officer Hawkins shot him. (Exhibit A, at 30-31, 39; Exhibit B at 26, 40-42). Officer Hawkins will also claim that he shot Mr. Banks because Mr. Banks hit him in the head; in fact, he told Mrs. Banks that he shot her husband because he "bum rushed" him. (Exhibit B, at 31-32, 45-47, 50). Mr. Banks did no such thing. (Exhibit B, at 31-32, 45-47, 50).

Officer Hawkins took five or six steps into the Banks' home before he shot Mr. Banks. (Exhibit D, at 92-93: 1-8). He says something struck him in the head, but he did not see anyone strike him, nor did he see Mr. Banks lay a hand on him. (Exhibit D, at 93:18-19, 98:1-8). Mr. Banks never touched Officer Hawkins. (Exhibit B, at 31-32, 45-47, 49-50; Exhibit D, at 93, 95, 96, 98, 100, 103, 108-111, 123). Mr. Banks was unarmed when he opened the door, and he was unarmed when Officer

7

Hawkins shot him. (Exhibit D, at 96:2-12). Officer Hawkins does not know how he was struck in the head or what struck him in the head, yet he intentionally shot Mr. Banks, nevertheless. (Exhibit D, at 93, 99:3-23, 108:6-9,109).

From the time Officer Hawkins entered the Banks' residence until the moment he shot Mr. Banks, Mr. Banks was in front of Officer Hawkins. (Exhibit D, at 100, 103). Whatever hit Officer Hawkins could not have come from Mr. Banks because Mr. Banks was forty-two inches in front of Officer Hawkins, and Officer Hawkins never saw Mr. Banks hit him or attempt to hit him. (Exhibit D, at 100, 103:8-13, 123, 128). At bottom, there is no evidence in the record of this case that Mr. Banks hit Officer Hawkins in the head or caused him to be hit in the head. (Exhibit D, at 93, 98, 99, 100, 103, 108-109, 110-111, 123, 128).

It is undisputed that when Officer Hawkins shot Mr. Banks, Mr. Banks had not committed a crime, he had not been suspected of committing a crime, he did not pose an immediate threat of death or serious injury to Officer Hawkins or to anyone else, and he did not attempt to resist or evade Officer Hawkins. (Exhibit D, at 85, 117; Exhibit E, at 54). Therefore, it was objectively unreasonable for Officer Hawkins to shoot Mr. Banks. *Ellison v. Lesher*, 796 F.3d 910, 916-917 (8th Cir. 2015) (it has been clearly established since at least December 2010 that a person who does not pose an immediate threat to an officer or to others has a federal right not to be shot by the officer).

2. **On February 17, 2017, the law was clearly established that a police officer responding to what he thinks is an emergency cannot automatically shoot a person who does not pose an immediate threat**

**to the officer or to others, therefore, Officer Hawkins is not entitled to qualified immunity.**

In order for Officer Hawkins to be liable for shooting Mr. Banks, however, Mr. Banks must demonstrate that on February 17, 2017, the law was clearly established that a police officer responding to what he thinks is an emergency cannot automatically shoot a person who does not pose an immediate threat to the officer or to others. *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (citing *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)). He will now demonstrate just that.

Defendants primary reliance is upon *Carswell v. Borough of Homestead 381 F. 3d 235, 243 (3rd Cir. 2004)* for its proposition that Hawkins faced a situation which required a split-second decision. Carswell is distinguishable on the facts alone. In Carswell, a) there were two or more officers present; b) the officers made four responses to his residence before the shooting; and c) the officers identified him and chased him. Carswell ran toward the officers in a threatening manner and disregarded the officers' instructions to stop.

Here, a) Hawkins did not await a second officer's arrival before his kicks were made; b) Hawkins waited ten minutes outside the residence and identified no one outside the residence. Hawkins made only one visit to the residence; and c) Banks made no adversarial movement, threatening or otherwise toward Hawkins before Hawkins kicked Banks' door, other than to open it.

9

Further, defendants advance the facts in *Loch v City of Litchfield, 689 F. 3d 961 (8th Cir. 2012)* for the "mistaken perception theory" of *Carswell*. The facts there are also distinguishable.

Loch a) had a pistol which he threatened to use; b) Loch's brother-in-law responded to the officer on scene that Loch had a weapon; c) the officer laid eyes on Loch and gave Loch instructions to stop and get on the ground; and d) when Loch accidently slipped and fell, the officer shot him because he reasonably thought Loch had a weapon.

Here, a) there was no identification of an assailant to the officer, b) there was no weapon nor report of a weapon; c) Hawkins had no belief that Banks had a weapon; and d) there was no prior instruction from Hawkins for Banks to do anything or to take any action before Hawkins shot Banks. In contrast, the officer in *Loch* waited 20-30 seconds while Loch was in his sight before he fired.

Without citation of authority, defendants also argue that Hawkins "choice of shooting Banks was at most a reasonable mistake." Def. Brief at p. 11. Hawkins' statement that he intended to shoot Banks takes his action out of the mistake category. (Dep. of Shelby Hawkins, at 93,99, 108:5-18, 109).

> a. **There is no evidence that anyone or anything associated with Banks' conduct caused Hawkins to be disoriented before Hawkins shot Banks**

Hawkins shot Banks as he was kicking, and Banks was opening the door to Banks' residence. Hawkins testified that this action was deliberate. Hawkins has attempted to explain his action as a) due to his being blinded upon the opening of

10

the door' b) due to his having been struck by an identified and the evidence reasonably points to, object which left gun prints on his forehead; c) possibly due to having seen plaintiff's arm raised when the door opened; and d) due to being disoriented. Defense counsel now argues that Hawkins shooting Banks was due to mistake. That perspective is disputed by the admissible material facts of both parties.

A reasonable jury could find that Hawkins was in the dark, narrow entry way to Banks house, when he kicked the door and that when the door opened, Hawkins could see into Banks lighted room rather than be blinded by the light; and that Banks could not see into the dark enclosed area from which Hawkins fired. It could also find a) that there is no item other than Hawkins' own gun which struck Hawkins and that it occurred after Hawkins fired his weapon at Banks; c) that Banks stood inside the house while Hawkins was on the steps and thus that Banks' hands were necessarily higher than or above Hawkins when Hawkins shot Banks; and d) that Hawkins' possible disorientation was due to Hawkins weapon having discharged. Thus, Hawkins' "disorientation" occurred after he fired his shot. Any fear he had prior to shooting Banks is not reasonable because the shot and injury to Banks occurred within a second or two. This fact makes Hawkins excuse or mistake theory different from both Loch, supra, and Carswell, supra which they cite (Def. Brief pp. 11-13). This fact also addresses Hawkins' "fear" that he did not want to "grapple" with Banks after he shot him. (Def. Brief p.17) Grappling could not have

been an issue because Banks fell backward rather than forward and went down 6 to 8 feet within his residence immediately upon being shot.

### 3. The City of Shannon Hills is liable for the damages Officer Hawkins caused Mr. Banks because had the SHPD done an inadequate background check, it would have never hired him in the first place.

Municipalities are "persons" within the meaning of 42 U.S.C. § 1983, but they cannot be held liable under § 1983 solely because they employ a tortfeasor. *Bd. of the Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 689 (1978)). A plaintiff seeking to impose liability on a municipality under § 1983 has to identify a municipal policy or custom that caused his injury. *Brown*, 520 U.S. at 403 (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989); *Pembaur v. City of Cincinnati*, 479 U.S. 469, 480-481 (1986); *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 689 (1978)).

A single decision can constitute an official policy if the person who makes the decision has final policy making authority, or if the person's acts or edicts may fairly be said to represent official policy, and a municipality cannot assert immunity or a good faith defense under § 1983 based on the good faith of its officers. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (citing *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978)); *Owen v. City of Independence*, 445 U.S. 622, 650 (1980). In this case, Chief Spears is the final decision maker for the SHPD, therefore, his acts represent the official policy of Shannon Hills, Arkansas.

(Dep. of Allen Spears, at 4); *Pembaur*, 475 U.S. at 480 (citing *Monell*, 436 U.S. at 694).

      A plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action led an employee to violate the plaintiff's federal rights must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences. *Bd. of the Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). In this case, Chief Spears's decision to hire Officer Hawkins was facially lawful, however, he made it with deliberate indifference as to the known or obvious consequence that Officer Hawkins was bound to violate the constitutional rights of persons with whom he came into contact.

      Chief Spears recruited Officer Hawkins to work for the SHPD, but his only knowledge of Officer Hawkins's work background was that he knew he worked for the Alexander, Arkansas fire department while he [Chief Spears] worked for the Alexander, Arkansas police department. (Exhibit E, at 19-21). Chief Spears knows that when an opening occurs in the SHPD he is supposed to make that opening known to the general public, however, he did not do so for the job Officer Hawkins ultimately accepted. (Dep. of Allen Spears, at 20). This is a textbook case of cronyism. Chief Spears could not have cared less whether Officer Hawkins could or would competently perform the duties of a police officer; he simply gave his buddy a job with no concern for the consequences that would obviously befall the citizenry subject to his buddy's incompetence.

Evidence of just how insouciant Chief Spears was is apparent when one examines what he failed to do after hiring Officer Hawkins. (Exhibit E, at 21-22). Since the SHPD hired Officer Hawkins, Chief Spears has not looked at any of his personnel records, nor has he examined any of Officer Hawkins's records to determine if he has completed the required online domestic violence training that SHPD officers have to complete. (Exhibit E, at 21-22). Chief Spears did not provide, and has not provided, any training of any kind to Officer Hawkins. (Exhibit E, at 17).

Mr. Banks filed a citizen complaint with the SHPD regarding Officer Hawkins's shooting him, but Chief Spears did not do anything with it, instead, he "…forwarded it to… counsel." (Exhibit E, at 28-29). Chief Spears did not give Mr. Banks any notice or acknowledgement that the SHPD received his complaint. (Exhibit E, at 28-29). Chief Spears asserts that he conducted an internal investigation of Officer Hawkins shooting Mr. Banks, but his investigation consisted solely of him and his assistant chief of police speaking with Officer Hawkins. (Exhibit E, at 30). He did not write a report, and he did not take any notes, yet he concluded that Officer Hawkins did not violate any SHPD policies. (Exhibit E, at 30, 39). Chief Spears does not know the dates he conducted his oral investigation, he did not investigate the scene of the shooting, he cannot recall the questions he asked Officer Hawkins, he cannot recall the questions his assistant chief of police asked Officer Hawkins, and he cannot recall Officer Hawkins's answers to any questions posed to him. (Exhibit E, at 33).

Officer Hawkins did not tell Chief Spears that he attempted to kick the Banks' door in, nor did Chief Spears ask him if he did. (Exhibit E, at 42). Officer Hawkins told Chief Spears that he was struck in the head by an object, but he could not describe what that object was, and Chief Spears never figured out what, if anything, hit Officer Hawkins in the head, and he never attempted to figure out what, if anything, hit Officer Hawkins in the head. (Exhibit E, at 46-47, 55-56).

Chief Spears's oral investigation did not include an interview with Ms. Kelley, Mr. Banks, Mrs. Banks, or the surgeon neighbor who attempted to administer first aid to Mr. Banks. (Dep. of Allen Spears, at 38). Two officers came to the scene after Officer Hawkins shot Mr. Banks, but Chief Spear's oral investigation also did not include an interview with either of these two officers, and Chief Spears did not share the results of his oral investigation with a single person; not even the SHPD's lawyer, the mayor of Shannon Hills, or the Arkansas State Police ("ASP"), which investigated Officer Hawkins's shooting of Mr. Banks. (Exhibit E, at 34-36, 48-49).

At bottom, Chief Spears hired his crony and left him to his own devices when it came time to police the citizenry. Chief Spears's callous indifference to the federal rights of Mr. Banks was the moving force behind Officer Hawkins's illegal use of force on Mr. Banks on February 17, 2017, therefore, the City of Shannon Hills, Arkansas is liable for that indifference. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694-695 (1978).

**4. The City of Shannon Hills is liable for the damages Officer Hawkins caused Mr. Banks because the SHPD failed to adequately train Officer Hawkins.**

A plaintiff who seeks to establish municipal liability on the theory that an inadequate training program led an employee to violate a plaintiff's rights must demonstrate that the municipal action was not simply negligent but was taken with deliberate indifference as to its known or obvious consequences. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). *Harris* held that if, in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in a violation of a person's federal rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury. 489 U.S. 378, 390 (1989).

An example of when a municipality's training program would be so inadequate that it would trigger municipal liability is a police department hiring police officers who they know may have to use deadly force and then failing to train those officers on the proper use of deadly force. *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989). The functional equivalent of that example happened in this case.

The SHPD does not train its officers on how to deal with domestic violence calls, instead, its officers obtain training from classes offered on the Internet, and

Chief Spears has never confirmed that Officer Hawkins has completed the internet course. (Exhibit E, at 8-10, 21-22, 59-60). Once an officer completes a training session, he or she is required to obtain a certificate of completion, and Chief Spears has never confirmed that Officer Hawkins has obtained a certificate of completion. (Exhibit E, at 8-10, 21-22). When the SHPD hires an officer, the only training the department offers is a directive that the officer read the SHPD handbook and complete a form indicating that he or she has done so, and Chief Spears has not confirmed that Officer Hawkins reach the SHPD handbook or completed a form indicating that he has. (Exhibit E, at 15-16, 21-22).

The SHPD did not provide Officer Hawkins with any training on how to conduct a forcible entry into a residence, nor did it train him on the meaning of reasonable suspicion or probable cause or the distinction between the two phrases. (Exhibit E, at 105, 115-117). In fact, Officer Hawkins does not know the difference between reasonable suspicion and probable cause. (Exhibit D, at 118). The SHPD leaves it up to its officers to decide whether to equip themselves with a taser when they go on patrol, and though it trains its officers to use the least amount of force that is necessary to gain control of a situation, it does not insist that officers equip themselves with a taser when they go on patrol. (Exhibit E, at 57). Chief Spears admits that if an officer is not equipped with a taser, he or she is not prepared to use the least amount of force that is necessary to gain control of a situation. (Dep. of Allen Spears, at 57).

The SHPD's training program is worse than inadequate; it is virtually non-existent, and its virtual non-existence was the proximate cause of Officer Hawkins's shooting Mr. Banks. In light of the duties assigned to SHPD officers, the need for more or different training was so obvious, and the inadequacy was so likely to result in a violation of Mr. Banks's federal rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need, therefore, the failure to provide proper training represents a policy for which the city is responsible and for which the city should be held liable. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

Conclusion

Upon the foregoing disputation of defendants' proposed findings of material undisputed facts, brief and legal arguments, the plaintiff respectfully submits that the defendants' motion for summary judgment should be denied.

Respectfully submitted,

/s/ John W. Walker – AB64046
JOHN W. WALKER, PA
1723 Broadway Street
Little Rock, Arkansas 72206
501-374-3758
Facsimile: 501-374-4187
Email: johnwalkeratty@aol.com