**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DISTRICT**

**JOHNNY BANKS**                                                                                **PLAINTIFF**

**VS.**                           **CASE NO. 4:18CV00259 BSM**

**SHELBY HAWKINS, in his individual capacity,
et al.**                                                                                            **DEFENDANTS**

<u>**DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED
MATERIAL FACTS**</u>

COME now Defendants, the City of Shannon Hills, Arkansas ("City") and Officer Shelby

Hawkins ("Ofc. Hawkins") in his individual and official capacity, by and through their counsel,

Sara Monaghan, and for their Response to Plaintiff's Statement of Undisputed Material Facts state:

1.      Johnny Banks ("Mr. Banks") and Vanessa Banks ("Mrs. Banks") married on

November 16, 2013 and settled in a home located in Alexander, Arkansas. (Dep. of Johnny Banks,

at 17;1 Dep. of Vanessa Banks, at 3).

**Response:** Defendants' admit the factual allegations in ¶ 1 are undisputed for the

purpose of the summary judgment record.

2.      On February 17, 2017, Mrs. Banks checked the mail at her and Mr. Banks's home

and found a letter that was addressed to her but it lacked a return address. (Dep. of Johnny Banks,

at 26; Dep. of Vanessa Banks, at 22-23). She opened the letter, which said in typed text "You

should know that your husband is sleeping around on you with multiple women." (Dep. of Vanessa

Banks, at 22-23).

**Response:** Defendants' admit the factual allegations in ¶ 2 are undisputed for the

purpose of the summary judgment record.

3.      Mrs. Banks became enraged, so she posted the letter and envelope on Facebook and started packing her belongings because she planned on leaving the marital home. (Dep. of Johnny Banks, at 26; Dep. of Vanessa Banks, at 23). Meanwhile, Mr. Banks was at work when one of his friends called him and said, "you need to look at Facebook." (Dep. of Johnny Banks, at 26). Mr. Banks looked at Facebook, saw the letter and envelope, and called Mrs. Banks and asked her why she posted the letter and envelope on Facebook and denied being unfaithful to her. (Dep. of Johnny Banks, at 27). Rather than listen to Mr. Banks, Mrs. Banks hung up the telephone. (Dep. of Johnny Banks, at 27).

**Response:** Defendants' admit the factual allegations in ¶ 3 are undisputed for the purpose of the summary judgment record.

4.      After hanging up on Mr. Banks, Mrs. Banks sent him a text message that said, "I'm done. I can't be with someone who is going to cheat on me." (Dep. of Johnny Banks, at 27). Mr. Banks sent a response text message that said, "I'm not cheating on you, I have never cheated on you, I have been faithful to you." (Dep. of Johnny Banks, at 27). Mrs. Banks sent a reply text message that said, "I'M DONE." (Dep. of Johnny Banks, at 27) (all capitals in original). At that point, Mr. Banks requested and obtained his supervisor's permission to leave work and go home. (Dep. of Johnny Banks, at 27).

**Response:** Defendants' admit the factual allegations in ¶ 4 are undisputed for the purpose of the summary judgment record.

5.      When Mr. Banks arrived at the marital home, he and Mrs. Banks started arguing in their bedroom, with Mr. Banks insisting that he had not been unfaithful and Mrs. Banks insisting that she did not believe hi mand was leaving. (Dep. Of Johnny Banks, at 28-30; Dep. of Vanessa Banks, at 23-24).

**Response:** Defendants' admit the factual allegations in ¶ 5 are undisputed for the purpose of the summary judgment record.

6.        In the midst of their argument, Mrs. Banks surreptitiously called 911 on her iPhone and placed the phone under a suitcase so Mr. Banks could not see it. (Dep. of Johnny Banks, at 28-29; Dep. of Vanessa Banks, at 24, 38). She deliberately refrained from speaking into the phone because she wanted whoever answered it to hear her and Mr. Banks's argument and dispatch a police officer. (Dep. of Vanessa Banks, at 24). At no point during their disagreement did Mr. Banks or Mrs. Banks get physical with each other; their entire disagreement was verbal. (Dep. of Johnny Banks, at 28- 30; Dep. of Vanessa Banks, at 23-26).

**Response:** Defendants' admit the factual allegations in ¶ 6 are undisputed for the purpose of the summary judgment record.

7.        Mrs. Banks did not call 911 because a genuine emergency existed, rather, she wanted a police officer to observe her pack her belongings, and she hoped the presence of an officer would deter Mr. Banks from pleading with her to stay. (Dep. of Vanessa Banks, at 38-39). Simply put, Mrs. Banks called 911 in an effort to have control of the situation, not because she was in any actual danger. (Dep. of Vanessa Banks. At 38-39).

**Response:** Regarding the factual allegations in ¶ 7, the cited material does not support the allegation that Ms. Banks did not call 911 because a "genuine emergency" existed or because she was not in "any actual danger." *Exhibit A*, Depo. of Vanessa Banks, at 38-39). Furthermore, the assertions are not fact based, but are purely argumentative. Therefore, the factual allegations in ¶ 7 should not be considered for purposes of determining the undisputed material facts or summary judgment.

8.      Mystic Kelley ("Ms. Kelley") worked as the 911 dispatch officer for the City of Shannon Hills, Arkansas on February 17, 2017 and took Mrs. Banks's call. (Dep. of Mystic Kelley, at 4, 9). She could hear a male and female arguing, but she did not hear any physical contact between the two. (Dep. of Mystic Kelley, at 9). Ms. Kelley dispatched Shelby Hawkins ("Officer Hawkins"), an officer with the Shannon Hills Police Department ("SHPD"), to the Banks' residence. (Dep. of Mystic Kelley, at 4; Dep. of Shelby Hawkins, at 28).

   **Response:** It is undisputed that Ms. Kelley worked for the Saline County Office of Emergency Management; Ms. Kelley's duties as dispatcher on February 17, 2017 included Shannon Hills, but also included Haskell and Alexander. *Exhibit 2,* Depo. of Mystic Kelley, at 7). The allegation, however, is immaterial. Regarding the remaining factual allegations in ¶ 8, defendants admit such allegations are undisputed for the purpose of summary judgement.

9.      After Mrs. Banks' placed her surreptitious call to 911 and before Officer Hawkins arrived at the Banks' residence, Mr. Banks left the bedroom where he and Mrs. Banks quarreled in order to get a bottle of water. (Dep. of Johnny Banks, at 29). He returned to the doorway of the bedroom, and Mrs. Banks told him that she was going to call the police to escort her from their home. (Dep. of Johnny Banks, at 29). Mr. Banks did not think much of her statement and observed her throw her phone on the bed. (Dep. of Johnny Banks, at 29). At this point, Mr. Banks still did not know that Mrs. Banks had already called 911. (Dep. of Johnny Banks, at 29).

   **Response:** Regarding the factual allegations in ¶ 9, it is undisputed that Ms. Banks placed a 911 call, that Mr. Banks left the bedroom to retrieve a water bottle, that Ms. Banks informed Mr. Banks she was going to call the police, and that Ms. Banks threw her telephone on the bed; but the factual allegations do not create a factual dispute to any facts alleged in

Defendants' SUMF. Defendants' admit that "Mr. Banks still did not know that Mrs. Banks *had already* called 911" but for clarity, as stated in sentence two of ¶ 9, it is undisputed that Ms. Banks informed Mr. Banks that she was going to call 911. Exhibit 3, Depo. of Johnny Banks, at 29 (emphasis added). Further, when Ofc. Hawkins began kicking the Banks' front door, Ms. Banks informed Mr. Banks that the kick was coming from a police officer and that the police had arrived. **Defendants' SUMF ¶ 51.**

10.     Approximately five minutes after Mrs. Banks called 911, she could hear the sound of a police radio outside. (Dep. of Vanessa Banks, at 24, 32).

**Response:** Defendants admit the factual allegation in ¶ 10 is undisputed for summary judgment purposes, but it does not create a factual dispute to any facts alleged in Defendants' SUMF. The five-minute time frame correlates with the fact that Ms. Banks called 911 at approximately 9:22 p.m. and Ofc. Hawkins arrived at the Banks' residence at approximately 9:26 p.m. *Exhibit 4*, Timestamped Central dispatch recording; *Exhibit 5*, Affidavit of Shelby Hawkins, ¶¶ 3-9. Furthermore, as Ofc. Hawkins walked the perimeter of the residence, he corresponded with dispatch multiple times—including running the tags of Mr. Banks' vehicle, calling for backup twice, that he observed a woman screaming inside the residence, and informing dispatch that he was going to make forced entry. *Exhibit 5*, ¶ 8. Thus, it is undisputed that Ms. Banks overheard Ofc. Hawkins' communication with dispatch and other officers over his handheld radio while he walked the parameter of the Banks' residence.

11.     When Officer Hawkins arrived at the Banks' residence, he parked his police vehicle and walked around the exterior of the Banks' home. (Dep. of Shelby Hawkins, at 51). As he did, he did not hear anything. (Dep. of Shelby Hawkins, at 52). He continued to walk around the Banks' home, and he heard a sound that he described as a screeching sound and a loud noise, but it was

not the sound of a human voice, and it did not emanate from inside the Banks' home. (Dep. of Shelby Hawkins, at 53). Officer Hawkins does not know what made the sound or noise. (Dep. of Shelby Hawkins, at 58).

**Response:** Regarding the factual allegations in ¶ 11, it is undisputed that when Ofc. Hawkins arrived at the Banks' residence, he parked his police vehicle and walked around the exterior of the Banks' home. *Exhibit 6*, Depo. of Shelby Hawkins, at 51. But for further clarification, it is undisputed that Ofc. Hawkins walked around the exterior of the home because as he arrived, he observed a vehicle with its emergency lights activated and he went "to that side of the house to check the truck and make sure there was no one in the vehicles." *Exhibit C-4, #6, SHPD Incident Report*; **Defendants' SUMF ¶¶ 35, 37-38;** *Exhibit 6* at 51. Regarding the second sentence in ¶ 11, the cited material does not support the allegation that Ofc. Hawkins did not hear anything during this time. *Exhibit 6*, at 52). Defendants', however, admit that it is undisputed that when Ofc. Hawkins was asked in his deposition "[w]hat did you hear when you walked around the house?", Ofc. Hawkins stated "I didn't hear anything *when I was over by the truck*. Then I was going --." *Id.* (emphasis added).

Regarding the remaining factual assertions in ¶ 11, over the last two years, Ofc. Hawkins has been required to give four separate accounts of the events that occurred when he arrived at 3023 Redhawk's Cove. *See* **Defendants' SUMF ¶36.** While those statements contain minor and non-material inconsistencies with respect to the exact noises he heard within the residence and where the noises were coming from inside the residence—all of his statements have remained consistent and it is undisputed that he heard noises from inside the home that sounded as if a woman's voice was being muffled. **Id.** The noises and muffled screams lead Ofc. Hawkins to

believe that a woman's life was in imminent danger. **Id.** Specifically, Ofc. Hawkins has consistently stated that he heard a woman say "NO! NO! NO!". **Id.**

It is undisputed that while Ofc. Hawkins was positioned at the back-left side of the residence, by the fence, Ofc. Hawkins heard a sound, that he described as a screeching sound and a loud noise, and that it was not a human voice. *Exhibit 6*, at 53).  The assertion that Ofc. Hawkins did not know what made the sound or noise, however, is misleading—because yes, Ofc. Hawkins did not know what the noise was, at that particular moment; but the noise caused Ofc. Hawkins to believe that something wrong was taking place inside the residence. *Exhibit 6*, at 58-59. Ofc. Hawkins stated that noise he heard could have been a scream. *Exhibit 6*, at 109.  The cited material does not support the allegation that the noise Ofc. Hawkins heard did not come from inside the home. *Exhibit 6*, at 53. After hearing the noise, Ofc. Hawkins proceeded to the front of the residence to determine and pinpoint the exact source of the unidentified noise. **Defendants' SUMF ¶ 38.** Ofc Hawkins made clear that he determined the noises were screams and coming from inside the residence. *Exhibit C-4, #6, SHPD Incident Report*; **Defendants' SUMF ¶ 39.** Furthermore, addressing both the issue of whether Ofc. Hawkins knew what made the noise and the exact location of the noise—Ofc. Hawkins clearly stated to the dispatcher that there was "a female screaming inside the residence." *See Exhibit 4*, Timestamped Central dispatch recording; *Exhibit 5*, ¶ 8.

12.     Officer Hawkins then observed Mr. Banks's vehicle parked in the Banks' driveway in a fashion that he considered unusual. (Dep. of Shelby Hawkins, at 54). The vehicle also had its emergency lights on. (Dep. of Shelby Hawkins, at 54). Officer Hawkins admits that Mr. Banks's vehicle was not parked illegally, and he also admits that it was not illegal for the vehicle to have its emergency lights activated. (Dep. of Shelby Hawkins, at 54).

**Response:**   Defendants' admit the factual allegations in ¶ 12 are undisputed for purposes of the summary judgment record. For further clarification, however, Ofc. Hawkins has stated multiple times that the vehicle's position and active emergency lights signaled to Ofc. Hawkins that something unusual was occurring; specifically, '[t]he thing that stood out the most upon [][Ofc. Hawkins'] arrival was the truck" and he "got out and walked around [the first half of the house] . . . because [][he] noticed something was off." *Exhibit 6*, at 51, 61; *see also* **Defendants' SUMF ¶ 34─35.** The material Plaintiff cited also furthers that Attorney Walker interrupted Ofc. Hawkins and did not let Ofc. Hawkins clarify what made the vehicle's position unusual, despite not being illegal. *Exhibit 6*, at 54.

Ofc. Hawkins searched the area around the truck for "[a]nybody that may need assistance, as far as being involved in a disturbance, if there are any suspects or victims that may be outside, you know, anybody that didn't see me pull up that wanted to talk to me." *Exhibit 6*, at 77. Ofc. Hawkins determined that something wrong was taking place inside the Banks' residence based on the "the initial 911 call, that there was . . . a disturbance . . . in the house. . . . And then the truck was parked . . . in the driveway with the emergency flasher on . . . [][he] took that as a - - you know, most the time when people do that, it's like, a signal like Hey, over here, type deal that can't talk. So [][he] took that into consideration, and then at this point [][he] heard the No, no, nos, the muffled No, no, nos at the window, and then all of that combined together was how [][he] drew [][his] conclusion that there was an incident going on inside that house." *Exhibit 6*, at 58-59).

13.    Officer Hawkins continued to search the exterior of the Banks' home for five to eight minutes. (Dep. of Shelby Hawkins, at 55-56, 62, 67). He then knocked on the Banks' front door and announced himself, but no one answered. (Dep. of Shelby Hawkins, at 62-63, 67). Neither

Mr. Banks nor Mrs. Banks heard Officer Hawkins knock on the door, and neither heard him announce himself. (Dep. of Johnny Banks, at 36; Dep. of Vanessa Banks, at 24-25).

**Response:** Defendants' deny the characterization and assertion that "Officer Hawkins continued to search the exterior of the Banks' home for *five to eight minutes*." (emphasis added). Plaintiff asserts multiple times throughout his Statement of Undisputed Material Facts that Ofc. Hawkins was at the Banks' residence between eight and ten minutes before attempting to make forced entry; this timeframe, however, is unfounded and a mischaracterization created by Attorney Walker. *Exhibit 6*, at 48-49); *see e.g.*, Plaintiff's SUMF ¶¶ 13, 15, 16, 33, & 34. Ofc. Hawkins denied in his deposition that he was at the Banks' residence between eight-and-ten minutes. *Exhibit 6*, at 48-49. Ofc. Hawkins stated in his deposition that he was outside the Banks' residence for not ten minutes, but roughly between five and eight minutes. *Exhibit 6*, at 55, 67. It, however, is undisputed that Ofc. Hawkins arrived at the Banks residence at approximately 9:26 p.m., attempted to make forced entry at approximately 9:29 p.m., and reported shots fired at approximately 9:31 p.m. *Exhibit 4*; *Exhibit 5*, ¶ 8(j)-(l). Thus, it is undisputed that Ofc. Hawkins was at the Banks' residence for only five (5) minutes before reporting shots fired—making it impossible for him to have been at the residence for eight-to-ten minutes, and impossible for him to have searched the exterior of the residence for five-to-eight minutes. *Exhibit 5*, ¶ 8(j)-(l). Defendants' admit that it is undisputed that Ofc. Hawkins knocked and announced himself three times at the Banks' residence. *Exhibit 6*, at 62-63. Regarding the last sentence in ¶ 12, Defendants' admit that it is undisputed for summary judgement purposes that Mr. Banks and Ms. Banks stated in their depositions that they did not hear Ofc. Hawkins knock or announce himself. *Exhibit 3*, at 36; *Exhibit 1*, at 24-25.

14.     When Officer Hawkins knocked on the door, he did not hear any sounds emanating from the interior of the Banks, home, so he walked around the exterior of the Banks' home for a second time, and this time he positioned himself next to a window on the left side of the home in order to "…try to listen into the window again to see if there was any change in what [he] was hearing." (Dep. of Shelby Hawkins, at 63, 67).

**Response:** Regarding the factual allegations in ¶ 14, Defendants' admit the allegations are undisputed, but the allegations must be further explained because Plaintiff failed to fully clarify Ofc. Hawkins' position. Ofc. Hawkins stated that he did not hear any sounds emanating from the interior of the home, specifically, at the time he knocked and announced himself. *Exhibit 6*, at 63. Ofc. Hawkins positioned himself next to a window, but a bush was between Ofc. Hawkins and the window. *Exhibit 6*, at 63-65, 76; *see also Exhibit C-8 to SUMF, ASP Photographs of the Banks Residence*. Further, the window Ofc. Hawkins positioned himself next to was not directly on the left side of the house and Ofc. Hawkins made that clear in his deposition—"[t]hen - - well, it's not really the side of the house. Their front door has got a corridor and -- I'm trying to – right here on that west, the west side of the house is the window." *Exhibit 6*, at 64, 66-68. The misstatement by Plaintiff regarding the location of the window, however, is immaterial and does not create a material factual dispute for the purpose of summary judgment.

15.     While positioned next to a window on the left side of the Banks' home, Officer Hawkins heard voices, but he could not "… make out what was going on." (Dep. of Shelby Hawkins, at 64-65, 67). He stayed at the window for approximately two minutes, which brought the total amount of time he had been outside the Banks" home at this point to ten minutes. (Dep. of Shelby Hawkins, at 64, 68).

**Response:** Regarding the first sentence in ¶ 14, it is undisputed that Ofc. Hawkins stated that "[a]t the window I could hear people, but I couldn't make out what was going on." *Exhibit 6*, at 64). Plaintiff, however, fails to fully disclose Ofc. Hawkins' testimony during his deposition on page 68 and fails to cite pages 66 and 67 clarifying that while at the window he heard people inside, and specifically, that "at the window is when [][he] heard the 'No, no, no,' the second time." *Exhibit 6*, at 64, 66-68. Furthermore, as stated on **Defendants' Response No. 14**, Ofc. Hawkins made clear in his deposition that the window was not fully on the side of the residence—"[t]hen - - well, it's not really the side of the house. Their front door has got a corridor and -- I'm trying to – right here on that west, the west side of the house is the window. And at the window is when I heard the '[n]o, no, no' the second time." *Exhibit 6*, at 68.

Defendants' deny that Ofc. Hawkins was at the window for two minutes; Ofc. Hawkins clearly denied that it took him one or two minutes to walk to the window and the pages Plaintiff cited does not support the factual allegation, does not mention two minutes, and does not mention the exact amount of time spent at the window. *Exhibit 6*, at 64, 68. Defendants' deny that the total amount of time Ofc. Hawkins was outside the Banks' residence was ten minutes. *See* **Defendants' Response No. 13.** Ofc. Hawkins stated in his deposition that the time spent was "approximately ten minutes", not a definite ten minutes. *Exhibit 6*, at 64, 68. Furthermore, it is undisputed that Ofc. Hawkins arrived at the Banks' residence at approximately 9:26 p.m., attempted to make forced entry at approximately 9:29 p.m., and reported shots fired at approximately 9:31 p.m. *Exhibit 4*; *Exhibit 5*, ¶ 8(j)-(l). Thus, it is undisputed that Ofc. Hawkins was at the Banks' residence for only five (5) minutes before reporting shots fired—making it impossible for him to have been at the residence for eight-to-ten minutes, and impossible for him to have listened at the window for two minutes. *Exhibit 4*; *Exhibit 5*, ¶ 8(j)-(l).

11

16.     During the ten-minute time period when Officer Hawkins was outside the Banks'
home, Mr. Banks and Mrs. Banks did not argue; in fact, they stopped arguing once Mrs. Banks
heard Officer Hawkins arrive at the marital home. (Dep. of Vanessa Banks, at 33). They continued
to talk, but no one yelled or screamed. (Dep. of Johnny Banks, at 29-30, 40; Dep. of Vanessa
Banks, at 33-34).

Response: Defendants' deny the ten-minute time period characterized by Plaintiff.
*See* **Defendants Responses No. 13 & 15.** Defendants' deny that Mr. and Ms. Banks stopped
arguing; Mr. Banks admits that "[a]nd so I'm standing in my doorway, and I mean, we were
arguing, but I mean, it wasn't like screaming and yelling, you know, we were just arguing. And
then all of a sudden I heard . . . kick on the door . . .." *Exhibit 3*, at 29-30.  In Plaintiff's cited
material he stated that he and Ms. Banks were not yelling or screaming, but he characterizes their
communication as an argument, twice, and does not use the word "talk" at all. *Id.*  Regardless, the
factual allegation is immaterial and does not create a factual dispute for the purpose of summary
judgment.

17.     While standing outside a window on the left side of the Banks' home, Officer
Hawkins heard what he described as a "muffled 'no, no, no'." (Dep. of Shelby Hawkins, at 68).
He then went to the Banks' front door for a second time, and instead of knocking and announcing
himself, he started kicking the door, and as he did, he did not announce himself. (Dep. of Shelby
Hawkins, at 69-70). He also had his firearm in his hand as he kicked the door. (Dep. of Shelby
Hawkins, at 70). Although it was approximately 10:00 p.m. and dark, Officer Hawkins did not use
a flashlight as he tried to force his way into the Banks' home. (Dep. of Shelby Hawkins, at 29, 74).

Response: Defendants' admit that it is undisputed that as Ofc. Hawkins stood
outside the window—specifically, the Banks' bedroom window on the west side of the house,

where the Banks' were arguing—Ofc. Hawkins heard a muffled no, no, no. *Exhibit 6*, at 64, 66-68; *see also* **Defendant's SUMF ¶¶ 36-50; Defendants' Responses No. 14 & 15.** At this point, per Ofc. Hawkins and the material cited by Plaintiff, it was the second time Ofc. Hawkins heard the "[n]o, no, no." *Exhibit 6*, at 68.

Defendants' admit that it is undisputed that Ofc. Hawkins went back to the Banks' front door, for a second time, and started kicking the door. *Exhibit 6*, at 69-70.  The factual allegation, however, must be further clarified—before Ofc. Hawkins started kicking the door he called for backup. *Exhibit 6*, at 70, 79-80. Defendants' deny that as Ofc. Hawkins kicked the door he did not announce himself—Ofc. Hawkins clearly stated in his deposition that as he attempted to kick the door he said "Police." *Exhibit 6*, at 72. It is undisputed that Ofc. Hawkins had his service pistol in his hand as he kicked the door. *Exhibit 6*, at 70-72. Defendants' deny the allegation that it was approximately 10:00p.m.—Ofc. Hawkins attempted to make forced entry into the Banks' residence between 9:29p.m. and 9:31p.m.—the exact time, however, is immaterial. *Exhibit 4*; *Exhibit 5*, ¶ 8(j)-(l). It is undisputed that the corridor was dark and Ofc. Hawkins did not use a flashlight as he attempted to make forced entry. *Exhibit 6*, at 29, 74.

18.     Mr. Banks heard what sounded like a battering ram hitting his front door. (Dep. of Johnny Banks, at 30). That sound was Officer Hawkins trying to kick the Banks' front door in. (Dep. of Shelby Hawkins, at 69-70). Mr. Banks heard the battering sound again, so he opened the door, and Officer Hawkins immediately shot him. (Dep. of Johnny Banks, at 30-31, 39; Dep. of Vanessa Banks, at 26, 40-42).

**Response:** Defendants' admit that it is undisputed that Mr. Banks described Ofc. Hawkins' kicking of the door sounded like a battering ram hitting his door. *Exhibit 3*, at 30. Defendants' admit that it is undisputed that Ofc. Hawkins' attempted to kick in the Banks' front

door, *Exhibit 6*, at 69-70, but the characterization of the sound was described by Mr. Banks and not by Ofc. Hawkins. *Exhibit 3*, at 30. Regarding the last sentence in ¶ 19, Defendants' admit that Mr. Banks opened the door, but Plaintiff fails to fully explain the actions and information known to Mr. Banks immediately before and as the door was opened. Before opening the door, Ms. Banks informed Mr. Banks that the kick was coming from a police officer and that the police had arrived. **Defendants SUMF ¶ 51**. After hearing the first kick, Mr. Banks stated "what is going on?" and then after the second kick, Mr. Banks stated "Who the fuck is this?" *Exhibit 3*, at 38-39. Mr. Banks statement of "who the fuck is this" was stated with such amplification that Ofc. Hawkins was able to hear it from outside the residence and characterized Mr. Banks' statement as "an aggressive, who the fuck is this." *Exhibit 6*, at 101. On the final kick, Mr. Banks opened the door from inside the residence with his left hand and placed his right hand on the wall above his head. **Defendants SUMF ¶ 54.** Regardless the factual allegations in ¶ 18 do not create a factual dispute to any facts alleged in Defendants' SUMF.

19.      When Mr. Banks opened the door he was not armed nor did he have anything in his hands. (Dep. of Johnny Banks, at 41-42; Dep. of Vanessa Banks, at 49; Dep. of Shelby Hawkins, at 91, 96, 123).

         **Response:** Defendants' admit the factual allegations in ¶ 19 are undisputed for the purpose of the summary judgment record.

20.      Mr. Banks fell to the floor after Officer Hawkins shot him. (Dep. of Johnny Banks, at 30). Officer Hawkins then said, "Put your hands, get on your stomach, put your hands on your back." (Dep. of Johnny Banks, at 30). Mr. Banks responded, "Why the fuck did you shoot me?" (Dep. of Johnny Banks, at 30-31). Lying face down, Mr. Banks put his hands behind his back, and Officer Hawkins then put his knee in Mr. Banks's back and grabbed his hands. (Dep. of Johnny

Banks, at 31). In the meantime, Mr. Banks bled profusely from the gunshot wound Officer Hawkins inflicted on him. (Dep. of Johnny Banks, at 31).

**Response:** Defendants' admit the factual allegations in ¶ 20 are undisputed for the purpose of the summary judgment record.

21.     Mr. Banks pleaded with Officer Hawkins to let him call his sister or his father. (Dep. of Johnny Banks, at 32). Officer Hawkins rejected his request, saying "You don't need to do that right now." (Dep. of Johnny Banks, at 32). Mrs. Banks attempted to tend to Mr. Banks's bloody wound, but Officer Hawkins ordered her to leave her own home. (Dep. of Vanessa Banks, at 27-28). She complied with his order and went a neighboring couple's home. (Dep. of Vanessa Banks, 27-28). One member of that couple is a surgeon, and when Mrs. Banks told him that Mr. Banks had been shot and was bleeding, he immediately went to the Banks' home to attempt to render aid to Mr. Banks. (Dep. of Johnny Banks, at 34).

**Response:** It is undisputed that Mr. Banks requested Ofc. Hawkins let him call his sister or brother. *Exhibit 3*, at 32; **Defendants SUMF ¶ 84**. Defendants' admit it is undisputed that Ofc. Hawkins rejected Mr. Banks' request, but for further clarity, Ofc. Hawkins rejected the request because he wanted to assure Mr. Banks kept his blood pressure down. **Defendants SUMF ¶ 84**. It is undisputed that Ms. Banks attempted to tend to Mr. Banks' injuries and that Ofc. Hawkins ordered her to leave the residence. **Defendants SUMF ¶¶ 82-84**. It is undisputed that Ms. Banks complied and went to a neighbor's home. *Exhibit 1*, at 27-28. Defendants' deny that Ms. Banks told her neighbor, Dr. Derek Buck ("Dr. Buck"), that Mr. Banks had been shot and was bleeding; Plaintiff's cited material does not address who told Dr. Buck. *Exhibit 3*, at 34. Ms. Banks, however, testified that when she went over to the neighbor's house, Ms. Amanda Buck told Mr. Buck "Go over there, go over there. They shot trey." *Exhibit 1*, at 28.  Regardless of who informed

15

Dr. Buck, the allegation is immaterial and does not create a dispute of material fact for summary judgment purposes. Furthermore, Defendants' admit that Dr. Buck went to the Banks' residence to render aid. *Exhibit 3*, at 34.

22.    The surgeon neighbor could not stop Mr. Banks's bleeding, but an ambulance did eventually arrive and transported Mr. Banks to the University of Arkansas for Medical Sciences ("UAMS") for emergency surgery. (Dep. of Johnny Banks, at 34-35).

    **Response:** Defendants' admit that Mr. Banks stated in his deposition that "And [the surgeon neighbor, Dr. Buck,] kept just trying to reassure me, '[y]ou're not gonna die.' And then [Dr. Buck] looked and he was like—And I heard him talk to the heavier set officer that was there and he told him, 'I can't stop the bleeding.' [The neighbor] said, '[w]e need to get the ambulance here quick.'" *Exhibit 3*, at 34-35. Defendants' admit that Mr. Banks was transported to the University of Arkansas Medical Sciences ("UAMS") for surgery; but the cited material does not characterize the surgery as "emergency" or state the word "emergency." *Id.* Regardless of the admissions and clarifications, the factual allegations in ¶ 22 are immaterial and do not create a dispute of material fact for purposes of summary judgment.

23.    The bullet Officer Hawkins fired into Mr. Banks severed a nerve in Mr. Banks's leg and clipped his femoral artery. (Dep. of Johnny Banks, at 47). The UAMS surgical team removed a vein from Mr. Banks's right leg and inserted it into his left leg. (Dep. of Johnny Banks, at 47-48). During the surgery, however, that vein collapsed, so the surgical team had to insert a stent into Mr. Banks's left leg. (Dep. of Johnny Banks, at 47-48). Mr. Banks spent a total of five days at UAMS. (Dep. of Johnny Banks, at 49).

    **Response:** The factual allegations in ¶ 23 are undisputed for purposes of summary judgment; however, even if the allegations were in dispute, they are immaterial.

24.     After the surgery, Mr. Banks had to have his stent checked every three months. (Dep. of Johnny Banks, at 49). A year after the surgery, he had to have it checked every six months. (Dep. of Johnny Banks, at 49). Currently, he has to have an annual ultrasound on his left leg in order to ensure that the stent remains unclogged and that blood continues to flow through it. (Dep. of Johnny Banks, at 47-48).

**Response:** The factual allegations in ¶ 24 are undisputed for purposes of summary judgment; however, even if the allegations were in dispute, they are immaterial.

25.     Mr. Banks experiences freezing sensations in his left foot as a result of the injury Officer Hawkins inflicted on him. (Dep. of Johnny Banks, at 53). The scar tissue from his surgery resulted in fatty tissue pockets forming on both sides of his leg that cause him constant pain. (Dep. of Johnny Banks, at 53). At times, the area where the surgical team cut into his leg swells, which also causes him pain and discomfort when he wears denim because the fabric rubs the swollen area raw. (Dep. of Johnny Banks, at 53).

**Response:** The factual allegations in ¶ 25 are undisputed for purposes of summary judgment; however, even if the allegations were in dispute, they are immaterial.

26.     The bullet Officer Hawkins fired into Mr. Banks severed a nerve in Mr. Banks's leg and caused damage that cannot be repaired. (Dep. of Johnny Banks, at 54). Additionally, an area from the bottom of Mr. Banks's knee to the top of his groin has severe nerve damage that causes him sleepless nights because of a sensation of electrical shocks running up and down his leg. (Dep. of Johnny Banks, at 54).

**Response:** The factual allegations in ¶ 26 are undisputed for purposes of summary judgment; however, even if the allegations were in dispute, they are immaterial.

27.    During a music festival in Austin, Texas, Mr. Banks's leg "just gave out," which caused him to "face plant" in front of scores of concertgoers. (Dep. of Johnny Banks, at 54). He felt a burning sensation in his leg that lasted an hour. (Dep. of Johnny Banks, at 54). The same thing happened again, but this time it happened when he and his wife were walking in downtown Hot Springs, Arkansas. (Dep. of Johnny Banks, at 54-55).

    **Response:** The factual allegations in ¶ 27 are undisputed for purposes of summary judgment; however, even if the allegations were in dispute, they are immaterial.

28.    If Mr. Banks stands for more than forty-five minutes he will begin to experience pain in his leg. (Dep. of Johnny Banks, at 55). If he rubs the area where Officer Hawkins shot him he feels a burning sensation. (Dep. of Johnny Banks, at 55-56). After his surgery, he had fifty-four staples in his leg, and he still experiences pain in the area where those staples were located. (Dep. of Johnny Banks, at 56). He also cannot put any meaningful pressure on his left leg, which means if he has to bend down, the bulk of his weight has to be on his right leg. (Dep. of Johnny Banks, at 56). The injury Officer Hawkins caused also resulted in Mr. Banks having erectile dysfunction. (Dep. of Johnny Banks, at 56).

    **Response:** The factual allegations in ¶ 28 are undisputed for purposes of summary judgment; however, even if the allegations were in dispute, they are immaterial.

29.    Officer Hawkins's shooting of Mr. Banks caused Mr. Banks's left lung to partially collapse, which currently causes him breathing difficulties. (Dep. of Johnny Banks, at 57-SS). The shooting and resulting injuries also caused Mr. Banks to have post-traumatic stress disorder. (Dep. of Johnny Banks, at 60-61).

    **Response:** The factual allegations in ¶ 29 are undisputed for purposes of summary judgment; however, even if the allegations were in dispute, they are immaterial.

30.     Officer Hawkins asserts that he shot Mr. Banks because when Mr. Banks opened the door, he [Officer Hawkins] "... felt a sharp pain in [his] head and was dizzy[,] and the blinding lights from the door being opened from inside the residence, (sic) then [he] could see from here (sic) a silhouette of a person standing in the entry, like (sic) charging manner. So [he] come (sic) back, and at this point in time [he] felt like that (sic) [he] was going to go down as far as just from being struck in the head. That's when [he] come (sic) up and saw him again, and it appeared that he was closer. So that's when [he] fired [his] service pistol from load ready." (Dep. of Shelby Hawkins, at 86-87).

        **Response:** Defendants' admit the factual allegations in ¶ 30. *Exhibit 6*, at 86-87.

31.     While first responders loaded Mr. Banks into an ambulance, Officer Hawkins told Mrs. Banks that he shot Mr. Banks because Mr. Banks "bum rushed" him. (Dep. of V. Banks, at 31-32, 45-47, 50). Mr. Banks did no such thing. (Dep. of V. Banks, at 31-32, 45-47, 50). All Mr. Banks did was open the door, and as soon as he did, Officer Hawkins shot him. (Dep. of V. Banks, at 31-32, 40-42, 45-47, 49-50).

        **Response:** Defendants' admit that Ms. Banks stated in her deposition that Ofc. Hawkins stated to her "Ma'am, I shot your husband because he bum-rushed me." *Exhibit 1*, at 31. Furthermore, this statement correlates with Ofc. Hawkins radio communication at 9:31 p.m. stating that he needed officers to "step it up, shots fired, suspect tried to rush me at the door." *Exhibit 5*, ¶ 8(l). The allegation that no such thing happened is an assertion made by Ms. Banks; and is purely argumentative. *Exhibit 1*, at 31-32, 45-47, 50. Defendants' deny that "[a]ll Mr. Banks did was open the door, and as soon as he did, Ofc. Hawkins shot him." Specifically, Mr. Banks aggressively yelled "who the fuck is this" as he answered the door, Mr. Banks opened the door with force, Mr. Banks placed his hand on the wall above his head as he opened the door, and Mr. Banks stood in

an aggressive stance. **Defendants' SUMF ¶¶ 52-55.** Defendants, do however, admit that it is undisputed that all of this occurred very quickly and almost instantaneously. **Defendants' SUMF ¶ 55.**

32.     Mr. Banks never threatened Officer Hawkins or anyone else. (Dep. of Vanessa Banks, at 40-42, 45-47; Dep. of Shelby Hawkins, at 40-41). Officer Hawkins never heard Mr. Banks utter a word prior to shooting him. (Dep. of Shelby Hawkins, at 40-41).

    **Response:** Defendants' admit that Ofc. Hawkins specifically stated in his deposition that he never *heard* Mr. Banks make a threat or receive a threat. *Exhibit 6*, at 40-41 (emphasis added). Early in Ofc. Hawkins deposition he stated that he never heard Mr. Banks utter a word prior to shooting him, *id*—but later in his deposition he clarified that he heard "an aggressive, [w]ho the fuck is this, on the other side of the door." *Exhibit 6,* at 101.

33.     Officer Hawkins was outside the Banks' home for ten minutes before he started kicking their front door, and at no point during this ten minute time period did he see or hear anything that indicated that domestic violence was occurring inside the Banks' home. (Dep, of Shelby Hawkins, at 68, 78, 117). He did not see anything during this ten minute time period that he perceived to be a criminal offense. (Dep. of Shelby Hawkins, at 68, 79-80). He never saw Mr. Banks commit a criminal offense. (Dep. of Shelby Hawkins, at 85).

    **Response:** Regarding the ten-minute characterization throughout ¶ 33, Defendants' deny the ten-minute time frame. *See* **Defendants' Responses No. 13, 15, & 16.** It is undisputed that Ofc. Hawkins arrived at the Banks residence at approximately 9:26p.m. and radioed he was going to make forced entry at approximately 9:29p.m., totaling approximately three (3) minutes— making it impossible for Ofc. Hawkins to have been at the Banks' residence for ten minutes. *Exhibit 4*; *Exhibit 5*, ¶ 8(j)-(l).

Furthermore, Defendants' deny that Ofc. Hawkins' did not see or hear anything that would indicate a domestic disturbance was occurring inside the Banks' residence. First, Ofc. Hawkins clearly stated that he had evidence to believe that a domestic disturbance was occurring at the time he called for backup *Exhibit 6*, at 79-80—which Ofc. Hawkins called for backup twice; once at approximately 9:27 p.m. when he asked Ofc. Cooper to head that way because he heard "a female screaming inside the residence", *Exhibit 4*; *Exhibit 5*, ¶ 8(g)-(h)., and a second time at approximately 9:39 p.m. when he radioed that he needed all officers to "step it up." *Id. Exhibit 5*, ¶ 8(k). Second, Ofc. Hawkins clearly stated that he had heard noises, screeching, and screams coming from inside the home. *Exhibit 6*, at 78, 119; *see also* **Defendants SUMF ¶ ¶ 36-40**. Third, the trucks' unusual position in the drive way, coupled with the essence of the original 911 call, a domestic disturbance call, caused Ofc. Hawkins to believe something was happening inside the Banks' residence. *Exhibit 6*, at 58-59; *see* **Defendants' Response No. 13.**

Ofc. Hawkins, however, was asked by Attorney Walker: "And you hadn't heard anything, like dishes breaking or anything being thrown or anything within the house that would indicate that the house was being disrupted in some way? Is that fair to say?" *Exhibit 6*, at 117. And Ofc. Hawkins responded to Attorney Walker's question by stating: "[t]hat's fair." *Id.*  But Ofc. Hawkins answer, and the Plaintiff's cited material, does not support the factual allegation that he never saw or heard anything that indicated a domestic disturbance was occurring inside the Banks' home. *Exhibit 6*, at 68, 78, 117. It is undisputed that Ofc. Hawkins did not *see* anything that he perceived to be a criminal offense, *Exhibit 6*, at 68, 79-80 (emphasis added); and he never *saw* Mr. Banks commit a criminal offense. *Exhibit 6*, at 85 (emphasis added).

34.    During the ten minute time period that Officer Hawkins was outside the Banks' home before he attempted to force his way into their home, he did not hear anything emanating

from inside their home that would indicate a domestic disturbance. (Dep. of Shelby Hawkins, at 117).

    **Response:** Defendants deny the ten-minute time frame. **Defendants' Responses No. 13, 15, 16, & 33.** It is undisputed that Ofc. Hawkins arrived at the Banks residence at approximately 9:26 p.m. and radioed he was going to make forced entry at approximately 9:29p.m., totaling three (3) minutes. *Exhibit 4*; *Exhibit 5*, ¶ 8. Furthermore, Defendants' deny that Ofc. Hawkins' stated that he did not hear anything emanating from inside their home that would indicate a domestic disturbance. *Exhibit 6*, at 117. The material cited by the does not support the Plaintiff's factual allegation—as addressed in **Defendants' Response No. 33**, Ofc. Hawkins, however, was asked by Attorney Walker: "And you hadn't heard anything, like dishes breaking or anything being thrown or anything within the house that would indicate that the house was being disrupted in some way? Is that fair to say?" *Id*, at 117. And Ofc. Hawkins responded to Attorney Walker's question by stating: "[t]hat's fair." *Id.* at 117.

    35.  Officer Hawkins took five or six steps into the Banks' home before he shot Mr. Banks. (Dep. of Shelby Hawkins, at 92-93). He says something struck him in the head, but he did not see anyone strike him, nor did he see Mr. Banks lay a hand on him. (Dep. of Shelby Hawkins, at 93, 98). Mr. Banks never touched Officer Hawkins. (Dep. of Vanessa Banks, at 31-32, 45-47, 49-50; Dep. of Shelby Hawkins, at 93, 95, 96, 98, 100, 103, 108-111, 123). Mr. Banks never touched Officer Hawkins's firearm, nor did he attempt to do so. (Dep. of Shelby Hawkins, at 95). Mr. Banks was unarmed when he opened the door, and he was unarmed when Officer Hawkins shot him. (Dep. of Shelby Hawkins, at 96).

    **Response:** The factual allegation in the first sentence of ¶ 35 is blatantly false and a mischaracterization of Ofc. Hawkins testimony. *Exhibit 5*, ¶¶ 8-9; *Exhibit 6*, at 124-126.

Defendants' deny that Ofc. Hawkins took five or six steps into the Banks' home *before* he shot Mr. Banks. *Exhibit 5*, ¶¶ 8-9; *Id*, at 124-126 (emphasis added). Ofc. Hawkins did not enter the residence at any point prior to the point that he fired his weapon. *Exhibit 5*, ¶¶ 8-9. Defendants' admit that it is undisputed that Ofc. Hawkins entered the Banks' residence five or six steps *after* he fired his weapon; Ofc. Hawkins entered the residence to administer aid to Mr. Banks. *Exhibit 5*, ¶¶ 8-9. (emphasis added). It is undisputed that Ofc. Hawkins said something stuck him in the head, but he did not see anyone strike him. *Exhibit 6*, at 93, 98. Defendants' deny that Ofc. Hawkins' stated that he did not see Mr. Banks "lay a hand on him." *Id*. Defendants' admit, however, that Ofc. Hawkins did not see what or who struck him in the head; and Ofc. Hawkins stated that he did not see Mr. Banks touch or hit him. Id. Furthermore, the allegation is purely argumentative and should not be considered for summary judgment purposes. The factual allegation that Mr. Banks never touched Ofc. Hawkins' firearm, nor did he attempt to do so cannot be supported by Plaintiff's cited material and Defendants' deny the factual allegation. *Exhibit 6*, at 95. It is undisputed that Mr. Banks was unarmed when he opened the door and when Ofc. Hawkins shot him. *Exhibit 6*, at 96.

36.     Officer Hawkins does not know how he was struck in the head or what struck him in the head, yet he intentionally shot Mr. Banks nevertheless. (Dep. of Shelby Hawkins, at 93, 99, 108-109).

        **Response:** Defendants' admit the factual allegations in ¶ 36 are undisputed for the purpose of the summary judgment record.

37.     From the time Officer Hawkins entered the Banks' residence until the moment when he shot Mr. Banks, Mr. Banks was in front of Officer Hawkins. (Dep. of Shelby Hawkins, at 100, 103). Whatever hit Officer Hawkins could not have come from Mr. Banks because Mr.

Banks was forty-two inches in front of Officer Hawkins, and Officer Hawkins never saw Mr. Banks hit him or attempt to hit him. (Dep. of Shelby Hawkins, at 100, 103, 123, 128).

**Response:** As previously raised in Response No. 35, the notion that Ofc. Hawkins entered the Banks's residence then shot Mr. Banks is blatantly false. **Defendants' Response No. 35.** Regardless, Defendants' admit it is undisputed that Mr. Banks was in front of Ofc. Hawkins at all times. **Defendants' SUMF ¶ ¶ 65-66.**

It is undisputed that Mr. Banks was "within arm's reach and about three and half feet" of Ofc. Hawkins and Ofc. Hawkins never saw Mr. Banks "swing at him." *Exhibit 6*, at 100, 103. These undisputed facts, however, do not mean whatever hit Ofc. Hawkins could not have come from Mr. Banks—the allegation is not factual, but is purely argumentative. Furthermore, the allegation is immaterial and not based on Ofc. Hawkins' observations, but that of an objectively reasonable officer in the shoes of Ofc. Hawkins at the time of the incident. Therefore, the allegations are not fact based, but are argumentative and immaterial and should not be considered for purposes of determining the undisputed material facts or summary judgment.

38.     There is no evidence in the record of this case that Mr. Banks hit Officer Hawkins in the head or caused him to be hit in the head, and Officer Hawkins has not alleged that Mr. Banks hit him in the head or caused him to be hit in the head. (Dep. of Shelby Hawkins, at 93, 98, 99, 100, 103, 108- 109, 110-111, 123, 128).

**Response:** It is undisputed that Ofc. Hawkins does not know what hit him in the head or caused him to be hit in the head, thus Ofc. Hawkins is not alleging that Mr. Banks is the cause of his injuries. Regarding the remaining allegation, that there is no evidence in the record of this case that Mr. Banks hit Ofc. Hawkins or cause him to be hit in the head is purely argumentative and does not create a material dispute for the purpose of summary judgment.

24

39.     Officer Hawkins does not know what hit him in the head, and when he shot Mr. Banks, Mr. Banks had not done anything to him. (Dep. of Shelby Hawkins, at 108-111). When Officer Hawkins shot Mr. Banks, he had no knowledge about Mr. Banks that would have led him to believe that Mr. Banks had committed a criminal offense or that he was in the course of committing a criminal offense. (Dep. of Shelby Hawkins, at 117).

**Response:** It is undisputed that Ofc. Hawkins does not know what hit him in the head. *Exhibit 6*, at 108-111. The allegation that Mr. Banks had not done anything to Ofc. Hawkins is purely argumentative and does not create a material dispute for the purpose of summary judgment. Regarding the last sentence in ¶ 39, the Plaintiff's cited material does not support the allegation. *Exhibit 6*, at 117. Specifically, the cited deposition testimony of Ofc. Hawkins does not mention criminal offense or course of committing a criminal offense. *Id.* The question and answer of Ofc. Hawkins' depositions state and progress as follows:

> Q: All right. Now, is it fair to say that you had no personal knowledge of any offense that Mr. Banks had committed relating to an act of domestic violence; do you?
>
> A: No, I don't understand,
>
> Q: Is it fair to say that there was nothing –
>
> A: Excuse me. I didn't understand the last one. What was your last question?
>
> Q: You had no personal knowledge that would - - about Mr. Banks that would cause you to believe that he had committed an offense at the time?
>
> A: At the time of the incident?
>
> Q: Yes.
>
> A: No.

*Id*, at 117).

25

Based on the cited material and the progression of the questioning, it is undisputed that Ofc. Hawkins had no personal knowledge of any offense Mr. Banks had committed relating to an act of domestic violence. *Id.*

40.     Before shooting Mr. Banks, Officer Hawkins had taken five or six: steps into the Banks' home. (Dep. of Shelby Hawkins, at 92-93). At no time while he was in the Banks' home did he perceive that he was going to be killed or that he faced death. (Dep. of Shelby Hawkins, at 92-93, 118-119).

**Response:** As previously raised in **Defendants' Responses No. 35 & 37**, the notion that Ofc. Hawkins entered the Banks's residence then shot Mr. Banks is blatantly false. **Defendants' Responses No. 35 & 37.**  Defendants' deny that Ofc. Hawkins had taken five or six steps into the Banks' home because Ofc. Hawkins clearly entered the Banks' residence *after* he deployed his weapon. **Id.** (emphasis added). Thus, it is undisputed that at no time while Ofc. Hawkins was in the Banks' home—which was after he shot Mr. Banks' and was in effort to render first aid to Mr. Banks—did Ofc. Hawkins perceive that he was going to be killed or that he faced death. **Id.**

41.     When Officer Hawkins started kicking the Banks' front door, there was no domestic disturbance occurring, he did not see a domestic disturbance occurring, and he did not see anything unusual occurring in the Banks' home. (Dep. of Shelby Hawkins, at 106-107).

**Response:** Based on the Plaintiff's cited material in ¶ 41, Plaintiff fails to fully clarify Ofc. Hawkins' position and fails to accurately depict Ofc. Hawkins' statements made during his deposition. *Exhibit 6*, at 106-107. During Ofc. Hawkins' deposition, he was asked "[s]o there was no disturbance within the building; was there?"; Ofc. Hawkins attempted to answer the question, and stated, "Not at the time - -" but he was interrupted by Attorney Walker. *Id*, at 106.

Ofc. Hawkins then attempted to clarify his answer twice, but Attorney Walker refused. *Id*, at 106-107). During this back-and-forth, and before Ofc. Hawkins was given the chance to clarify his statement or the question—Ofc. Hawkins stated that he did not *see* a domestic disturbance occurring in the house. *Id.* (emphasis added). Ofc. Hawkins, however, never clearly stated that there was not a domestic disturbance occurring, and actually stated, "Okay. Hold on. Clarification. There was a disturbance in that house at one time." *Id*. Regarding the allegation that he did not see anything unusual occurring from inside the Banks' home, the statement is misleading. During Ofc. Hawkins deposition he was asked by Attorney Walker, "you never saw - - when you went inside the house, you saw nothing unusual; right? Before you pulled your revolver, you saw nothing unusual; did you?" *Id*, at 107. Plaintiff's question in the deposition, and the allegation in ¶ 41, take the position that Ofc. Hawkins entered the house before he shot Mr. Banks, but as made clear in **Defendants' Responses No. 35 & 37** that is incorrect. It is undisputed that after Ofc. Hawkins shot Mr. Banks, he entered the residence, and then did he not see anything unusual. *Id*.

42.     The SHPD did not provide Officer Hawkins with any training on how to conduct a forcible entry into a residence. (Dep. of Shelby Hawkins, at 105). The SHPD did not train Officer Hawkins on the meaning of reasonable suspicion or probable cause, nor did the department train him on the distinction between the two phrases. (Dep. of Shelby Hawkins, at 115-117). Officer Hawkins does not know the difference between reasonable suspicion and probable cause. (Dep. of Shelby Hawkins, at 118).

**Response:** Regarding the factual allegation in sentence one of ¶ 42, it is undisputed that SHPD did not provide Ofc. Hawkins with any training on how to conduct a forcible entry into a residence. *Exhibit 6*, at 105. It is undisputed that SHPF did not *formally* train Ofc. Hawkins on the meaning of probable cause or reasonable suspicion. *Exhibit 6*, at 116. Further, the SHPD did

not formally train Ofc. Hawkins, beyond yearlies, with respect to what probable cause is for a domestic violence arrest. *Id.* It is, however, undisputed that SHPD did not train Ofc. Hawkins the difference between probable cause and reasonable suspicion. *Id*, at 117. Furthermore, Defendants' deny that Ofc. Hawkins does not know the difference between reasonable suspicion and probable cause. Based on the material cited by the Plaintiff—Ofc. Hawkins clearly articulated that he knew the difference between reasonable suspicion and probable cause. *Id*, at 118. Regardless, the allegation is immaterial and does not create a material dispute of fact for the purpose of summary judgement.

43.    The SHPD did train Officer Hawkins to provide his full name, his identification, and his jurisdiction whenever he made an initial contact with a civilian, however, he did not do so in this case. (Dep. of Shelby Hawkins, at 119). The SHPD did not discipline Officer Hawkins for his failure to comply with the requirement that he provide his full name, his identification, and his jurisdiction whenever he made an initial contact with a civilian. (Dep. of Shelby Hawkins, at 119).

**Response:** Defendants' admit the factual allegations in ¶ 1 are undisputed for the purpose of the summary judgment record.

44.    Allen Spears ("Chief Spears") is the chief of police of the SHPD and is the final decision maker for the SHPD. (Dep. of Allen Spears, at 4).

**Response:** It is undisputed that Chief Spears is the chief of police for the SHPD. *Exhibit 7*, Depo. of Allen Spears, at 4. Chief Spears, however, is not the final decision maker and the material Plaintiff cited does not support the allegation or mention final decision maker. *Id*, at 4.

Further, pursuant to Arkansas law, the city council is the final municipal policymaker with respect to the policies of the police department. A.C.A § 14-52-101 states "[t]he

city council shall have the power to establish a city police department, to organize it under general superintendence of the mayor, and to prescribe its duties and define its powers." (West 2014). In *Brinkley v. City of Helena-West Helena*, the court held that, while A.C.A. § 14-52-101 provides the day-to-day supervision of the police department is undertaken by the mayor, it specifically imbues the city council with the authority to make police department policy. 2:11-CV-00207-SWW, 2014 WL 4164614 (E.D. Ark. Aug. 21, 2014). Similarly, the court has made clear that a chief of police is not a final policymaker. *Lewis v. Thomason*, No. 07–6033, 2009 WL 426543 (W.D. Ark. Feb. 20, 2009). As such, the *city council* is the final municipal policymaker when it comes to the official policies of the Shannon Hills Police Department. Thus, it is undisputed that Chief Spears is not the final policymaker or decisionmaker of the SHPD.

45.    The SHPD does not train its officers on how to deal with domestic violence calls, instead, its officers obtain training from classes offered on the Internet. (Dep. of Allen Spears, at 8-10, 59-60). Once an officer completes a training session, he or she is required to obtain a certificate of completion. (Dep. of Allen Spears, at 8-10).

**Response:** The factual allegation in the first two sentences of ¶ 45 are undisputed for the purposes of summary judgement record, but the Plaintiffs assertions are misleading and must be further clarified. The SHPD does not conduct trainings for its officers on how to deal with domestic violence calls; however, the SHPD provides training. *Exhibit 7*, at 8-10. The training is conduct by the Criminal Justice Institute in Little Rock and majority of the trainings are offered on-line. *Id*. Regarding the factual assertion in the final paragraph, an officer does not merely receive a certificate of completion. *Id*. It is undisputed that once an officer completes a training session, he or she is *tested* and then receives a certification. *Id*, at 10 (emphasis added). Regardless

of the misleading characterizations and the misstatement of the process for completing the training, being tested, and then receiving a certification is immaterial for summary judgment purposes.

46.     When the SHPD hires an officer, the only training the department offers is a directive that the officer read the SHPD handbook and complete a form indicating that he or she has done so. (Dep. of Allen Spears, at 15-16).

> **Response:** Defendants' admit this was the testimony of Allen Spears.

47.     Chief Spears recruited Officer Hawkins to work for the SHPD, but his only knowledge of Officer Hawkins's work background was that he knew he worked for the Alexander, Arkansas fire department while he [Chief Spears] worked for the Alexander, Arkansas police department. (Dep. of Allen Spears, at 19-21).

> **Response:** It is undisputed that Chief Spears recruited Ofc. Hawkins to work for the SHPD. Plaintiff, however, mischaracterizes the knowledge of Chief Spears. Chief Spears stated that he did not know Ofc. Hawkins as a police officer when he, Chief Spears, was at the Alexander Police Department (APD)—during this time, Chief Spears knew him as a fire fighter. *Exhibit 7*, at 19-21. Chief Spears, however, never stated in his deposition that the only work background he knew was that Ofc. Hawkins worked for the Alexander, Arkansas fire department. *Id*. Chief Spears clearly stated that "[b]eing in two police departments, [SHPD and APD,] both of them together, we're going to know each other." *Id*, at 21. Furthermore, Chief Spears stated that he assigned Assistant Chief Dudderar to facilitate the background check of Ofc. Hawkins. *Id*, at 22). Regardless, the factual allegation is immaterial and should not be considered for determining the undisputed material facts or summary judgment.

48.     Chief Spears knows that when an opening occurs in the SHPD he is supposed to make that opening known to the general public, however, he did not do so for the job Officer Hawkins ultimately accepted. (Dep. of Allen Spears, at 20).

**Response:** Defendants' admit the factual allegations in ¶ 48 are undisputed for the purpose of the summary judgment record.

49.     Since the SHPD hired Officer Hawkins, Chief Spears has not looked at any of his personnel records, nor has he examined any of Officer Hawkins's records to determine if he has completed the required online domestic violence training that SHPD officers have to complete. (Dep. of Allen Spears, at 21-22).

**Response:** Defendants' admit the factual allegations in ¶ 49 are undisputed for the purpose of the summary judgment record.

50.     Chief Spears did not provide, and has not provided, any training of any kind to Officer Hawkins. (Dep. of Allen Spears, at 17).

**Response:** It is undisputed that Chief Spears did not personally provide any *direct training* to Ofc. Hawkins. *Exhibit 7*, at 17) (emphasis added).

51.     Mr. Banks filed a citizen complaint with the SHPD regarding Officer Hawkins's shooting him, but Chief Spears did not do anything with it, instead, he "... forwarded it to ... counsel." (Dep. of Allen Spears, at 28-29). Chief Spears did not give Mr. Banks any notice or acknowledgement that the SHPD received his complaint. (Dep. of Allen Spears, at 28-29).

**Response:** Defendants' admit the factual allegations in ¶ 51 are undisputed for the purpose of the summary judgment record.

52.     Chief Spears asserts that he conducted an internal investigation of Officer Hawkins shooting Mr. Banks, but his investigation consisted solely of him and his assistant chief of police

speaking with Officer Hawkins. (Dep. of Allen Spears, at 30). Chief Spears did not write a report, and he did not take any notes, yet he concluded that Officer Hawkins did not violate any SHPD policies. (Dep. of Allen Spears, at 30, 39).

      **Response:** Defendants' admit the factual allegations in ¶ 52 are undisputed for the purpose of the summary judgment record.

53.    Chief Spears does not know the dates he conducted his oral investigation, he did not investigate the scene of the shooting, he cannot recall the questions he asked Officer Hawkins, he cannot recall the questions his assistant chief of police asked Officer Hawkins, and he cannot recall Officer Hawkins's answers to any questions posed to him. (Dep. of Allen Spears, at 33).

      **Response:** Defendants' admit the factual allegations in ¶ 53 are undisputed for the purpose of the summary judgment record.

54.    Officer Hawkins did not tell Chief Spears that he attempted to kick the Banks' door in, nor did Chief Spears ask him if he did. (Dep. of Allen Spears, at 42).

      **Response:** Defendants' admit the factual allegations in ¶ 54 are undisputed for the purpose of the summary judgment record. For further clarification, however, Chief Spears also stated that Ofc. Hawkins told him that Ofc. Hawkins knocked on the Banks' door and he attempted to make entry. *Exhibit 7,* at 42.

55.    Officer Hawkins told Chief Spears that he was struck in the head by an object, but he could not describe what that object was. (Dep. of Allen Spears, at 46-47). Chief Spears never figured out what, if anything, hit Officer Hawkins in the head, and he never tried to figure out what, if anything, hit Officer Hawkins in the head. (Dep. of Allen Spears, at 55-56).

      **Response:** Defendants' admit the factual allegations in ¶ 55 are undisputed for the purpose of the summary judgment record. The factual allegation that Chief Spears "never tried to

figure out what, if anything, hit Officer Hawkins in the head", however, needs to be further clarified. *Exhibit 7*, at 55-56. Chief Spears stated in his deposition that he did not seek to figure out what, if anything, hit Ofc. Hawkins in the head but he made clear that the "State Police investigated it." *Id*, at 55-56. Regardless, the factual allegation is immaterial for the purpose of summary judgment.

56.     Chief Spears's oral investigation did not include an interview with Ms. Kelley, Mr. Banks, Mrs. Banks, or the surgeon neighbor who attempted to administer first aid to Mr. Banks. (Dep. of Allen Spears, at 38). Two officers came to the scene after Officer Hawkins shot Mr. Banks, but Chief Spear's oral investigation also did not include an interview with either of these two officers. (Dep. of Allen Spears, at 48-49).

**Response:** Regarding the factual allegation in the first sentence of ¶ 56, Defendants' admit it is undisputed that Chief Spears oral investigation did not include an interview with Ms. Kelley, Mr. Banks, Ms. Banks, or Dr. Buck. *Exhibit 7*, at 38. It is undisputed that two officers, Ofc. Maxheimer and Ofc. Cooper, came to the scene after Ofc. Hawkins shot Mr. Banks. *Id*, at 48-49. Chief Spear's oral investigation did not include an interview with either officer, but Chief Spear's took the written statement of the officers. *Id.*

57.     Chief Spears did not share the results of his oral investigation with a single person; not even the SHPD's lawyer, the mayor of Shannon Hills, or the Arkansas State Police ("ASP"), which investigated Officer Hawkins's shooting of Mr. Banks. (Dep. of Allen Spears, at 34-36).

**Response:** Defendants' admit the factual allegations in ¶ 57 are undisputed for the purpose of the summary judgment record.

58.     Chief Spears acknowledges that Mr. Banks did not commit a crime at any point during the time Officer Hawkins was at the Banks' home. (Dep. of Allen Spears, at 51). Officer

Hawkins told Chief Spears that he never saw Mr. Banks commit a criminal offense. (Dep. of Allen Spears, at 54).

   **Response:** Defendants' admit the factual allegations in ¶ 58 are undisputed for the purpose of the summary judgment record. Plaintiff's allegations, however, are misleading and must be fully clarified. Chief Spears stated that to his knowledge Mr. Banks was not committing a crime at any time; but further stated that he determined that there was a reasonable belief that Mr. Banks was committing a crime. *Exhibit 7*, at 51-52. Regardless, the factual allegation is immaterial and does not create a material dispute of fact for the purpose of summary judgment.

59.  The SHPD leaves it up to its officers to decide whether to equip themselves with a taser when they go on patrol. (Dep. of Allen Spears, at 57). The SHPD trains its officers to use the least amount of force that is necessary to gain control of a situation, yet it does not insist that officers equip themselves with a taser when they go on patrol. (Dep. of Allen Spears, at 57). Chief Spears admits that if an officer is not equipped with a taser, he or she is not prepared to use the least amount of force that is necessary to gain control of a situation. (Dep. of Allen Spears, at 57).

   **Response:** Defendants' admit that this was Allen Spears' testimony.

60.  Chief Spears did not ask Officer Hawkins why he did not use his flashlight when he attempted to force his way into the Banks' residence, yet he expected him to do so, and after learning that he did not, he did not discipline Officer Hawkins for not doing so. (Dep. of Allen Spears, at 61- 62).

   **Response:** Defendants' admit this as Allen Spears' testimony.

61.  On February 28, 2018, Mr. Banks sued Officer Hawkins and the City of Shannon Hills, Arkansas, asserting claims of excessive force in violation of the Fourth Amendment; race

discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment; negligent hiring; failure to train; and ratification. (Compl., ¶¶ 55-86, Feb. 18, 2018, ECF No. 1).

      **Response:** Defendants' admit the factual allegations in ¶ 61 are undisputed for the purpose of the summary judgment record.

62.    On July 1, 2019, Mr. Banks amended his complaint to make it explicit that he is suing Officer Hawkins in his individual capacity. (Am. Compl., ¶ 5, July 1, 2019, ECF No. 27).

      **Response:** Defendants' admit the factual allegations in ¶ 62 are undisputed for the purpose of the summary judgment record.

Respectfully submitted,

BY:    Sara Monaghan
Ark. Bar No. 2005276
Attorneys for Defendants
P.O. Box 38
North Little Rock, AR 72115
TELEPHONE: 501-978-6122
FACSIMILE: 501-537-7262
EMAIL: smonaghan@arml.org