IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

JOHNNY  BANKS    )
         )
    Plaintiff,  )
         )
  v.      )  Case  2:18-cv-00039-BSM
         )
SHELBY HAWKINS; CITY OF )
SHANNON HILLS   )
         )
    Defendants. )

---

## Expert Report of John J. Ryan

1. My name is John Ryan.  I have been actively involved in police practices and law enforcement since 1981.  I was an active police officer for twenty years.  In the final year of my active career and since my retirement in June of 2002 from police services, I have been involved in police and law enforcement practices as a private consultant regarding law enforcement issues.

2. My education includes a Bachelor of Science Degree in the Administration of Justice from Roger Williams University in Bristol, Rhode Island; a Master of Science Degree in the Administration of Justice from Salve Regina University in Newport, Rhode Island and; a Juris Doctor Degree from Suffolk University Law School.

3. From 1993 until 2002 I served as an adjunct faculty member in the graduate Administration of Justice Program at Salve Regina University in Newport, Rhode Island.  In that capacity I was responsible for graduate courses on

1

Ex. A - J. Ryan Report 00001

Constitutional Issues in Law Enforcement; Police Misconduct/Civil Liability; Managing Police Organizations; Contemporary Issues in the Justice Field; Juvenile Justice; Mental Health Law; and Business Crime.

4. Since 2000, I have written several manuals for use by police officers.  Two of these manuals are extensively used by Rhode Island Law Enforcement agencies. These manuals are:  Rhode Island Law Enforcement Officers' Guide to Criminal Procedure, 2000, and Rhode Island Law Enforcement Officers' Bill of Rights, A Guide to Investigations and Hearings, 2000.  The other manuals are nationally distributed by the Public Agency Training Council as materials used in conjunction with training programs for public employees.  These manuals are: Legal and Liability Issues in the Public Schools, 2001; Policy Development for Public Safety Agencies, 2002, Civil Liability and Risk Management for Law Enforcement Agencies, 2003, Use of Force, 2004, Administrative Investigations In Law Enforcement Agencies, 2004, Legal and Liability Issues for Hostage Negotiators, 2005, Public Safety Media Relations (Manual and Guide) 2005, Arrest Search and Seizure, 2005, and Law and Best Practices for Successful Police Operations, 12 High Risk Critical Tasks That Impact Law Enforcement Operations and Create Exposure to Liability Litigation 2007, 2010, 2013 and 2016 editions,  Legal and Liability Risk Management Manual Guide-The Law and Best Practices of Successful Jail/corrections Operations 2009 and 2016 editions.

5. I also author an annual publication for law enforcement officers titled, Case Law for Critical Tasks in Law Enforcement.  This field guide provides officers with a

2

legal update on critical tasks such as search, seizure, use of force, pursuit, investigations and interrogations. This guide has been adopted by agencies around the United States for use by law enforcement personnel.

6. I am currently the co-director of the Legal and Liability Risk Management Institute along with James Alsup, and Lou Reiter. In that capacity I author and edit the institute's legal update service for law enforcement. This update service and an archive of all articles that I have written can be found at www.patc.com and www.llrmi.com. Additionally, I provide multiple on-line video roll-call trainings annually for both the road and jail operations. This on-line roll-call series is a subscription service offered by the Legal & Liability Risk Management Institute.

7. As part of the Legal and Liability Risk Management Institute I also conduct policy, training and operations reviews for law enforcement agencies and jails throughout the United States. These reviews focus on the manner in which agencies treat the critical tasks in law enforcement and jail operations. As part of these reviews I assist agencies in identifying areas in policy, training and operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in law enforcement and jail operations.

8. Since 1993, I have conducted numerous training sessions for public employees. Participants in this training have included law enforcement officials, school officials, attorneys and judges. I have provided training in the following areas:

    a. Policy development for public safety agencies.

3

b.   Legal Issues in police use of force.

c.   Legal Issues in internal affairs investigations.

d.   Police misconduct/civil liability.

e.   Legal/Liability Issues in Narcotics Operations.

f.   Arrest, Search and Seizure, & Interrogation.

g.   Racial profiling.

h.   Legal issues in public schools.

i.   Media relations for public safety agencies.

j.   Constitutional update for law enforcement officers.

k.   Basic training for detectives.

l.   Law enforcement officers' bill of rights/due process in administrative investigations.

m.   Legal/policy and decision-making factors in law enforcement pursuits including use of force/intervention tactics.

n.   Legal and policy Issues for hostage negotiators.

o.   Legal and liability issues for SWAT operations

p.   Legal and liability issues for jails

q.   High Risk Critical Tasks/Best Practices in Law Enforcement Operations.

9.  I am a former police Captain of the Providence Police Department in Providence, Rhode Island where I served for twenty years before retiring in 2002.  During my tenure as a police officer I served in the following capacities: patrol officer in both the Patrol Division and the Tactical Unit; a detective in the Detective Bureau; a sergeant in the Patrol Division; a lieutenant in the Patrol

4

Division; Director of Training; Director of the Department's Office of Public Affairs and; Director of the Department's Administrative Staff.  During most of my career I also took an active role in researching and authoring department policy.

10. Since my retirement in June of 2002 I have taught numerous courses on police policy and procedure, arrest, search and seizure, use of force, police pursuits, dealing with the mentally ill, emotionally disturbed, and suicidal, domestic violence, law enforcement's response to autism, law and best practices in the internal affairs process, civil liability for law enforcement agencies, and specialized courses for narcotics officers, SWAT commanders, and internal affairs officers.   Participants in these courses have come from thousands of law enforcement agencies around the United States.  Officers in attendance have come from departments with under ten sworn officers and departments with sworn officers numbering in the thousands.  These programs are conducted numerous times annually throughout the United States and also include on-line courses on these topics for law enforcement.

11. The course on policy and procedure focuses on critical tasks in law enforcement and includes, inter alia, policy issues relating to use of force; police pursuits; domestic violence; sexual harassment and external sexual misconduct; off-duty conduct; hiring & retention issues; internal affairs; supervisory practices; search and seizure; property and evidence; care, custody and transport of prisoners as well as training issues relating to critical tasks in law enforcement.

5

**Ex. A - J. Ryan Report 00005**

12. The program on High Risk Critical Tasks/Best Practices in Law Enforcement includes instruction on Use of Force including inter alia: dealing with individuals of diminished capacity i.e. emotionally disturbed, mentally impaired; and suicidal, excited delirium, as well as persons with disabilities and use of electronic control devices; Search-Seizure and Arrest; Pursuit and Emergency Vehicle Operation; Care, Custody, Control, and Restraint of Prisoners; Domestic Violence; Off-Duty Conduct; Sexual Harassment, Discrimination, and Misconduct; Selection and Hiring; Internal Affairs; Special Operations; and Property and Evidence.

13. As a co-director of the Legal & Liability Risk Management Institute I regularly research and draft policies for law enforcement agencies and jails relating to high-risk critical tasks including use of force, arrest-search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control & restraint of prisoners, sexual harassment-discrimination & sexual misconduct, domestic violence, arrest procedures, care, custody, and control of persons with disabilities, and dealing with the mentally ill. In addition, I write, record, produce, and distribute on-line training videos for law enforcement nationwide.

14. In 2002, I was a featured speaker at the national conference for the International Association of Law Enforcement Planners, which was held in Long Beach, California.

15. In 2002, I was a featured speaker at the National Internal Affairs Investigators Association conference, which was held in Tampa, Florida.

6

**Ex. A - J. Ryan Report 00006**

16. In 2004, I was a featured speaker at the Rhode Island Bar Association's Annual Meeting, speaking on Constitutional Issues related to Law Enforcement practices.

17. In 2005, I was a featured speaker at the National Sheriffs' Association Annual Conference, held in Louisville, Kentucky, where I presented training for legal advisors on Internal Affairs and Employee Discipline.

18. In 2005, I was a featured speaker at the annual national conference for Public Risk Managers (PRIMA) in Milwaukee where I conducted training for risk managers and attorneys representing police departments.  One of the trainings involved use of force while the second covered the high liability areas in law enforcement operations to include arrest, warrants, and other issues involving search and seizure, as well as police pursuits.

19. I have been a featured speaker annually, to include the 2011 session, of Georgetown Law Center's annual §1983 Civil Rights Litigation program.  I have regularly presented materials related to law enforcement policy, training and supervisory practices as well as use of force. In 2009 I presented materials for two sessions one of which was on the use of TASER and one which was a panel discussion on strip searches.  I have been published annually in materials from Georgetown Law Center related to this program.  The 2011 session was focused on reviewing current law enforcement practices and civil liability related to TASER.

7

20. In November of 2005, I was a featured speaker at the annual National Conference of the National Leagues of Cities & Towns in Seattle, Washington speaking on Contemporary Liability Risks for Law Enforcement Agencies.

21. In October of 2006, I was a featured speaker at the annual conference of National Internal Affairs Investigators' Association in Gatlinburg, Tennessee.

22. I have also provided lectures for attorneys on civil rights litigations relating to law enforcement operations, including a November of 2006 presentation for the Georgia Bar Association's ICLE program.

23. In 2007 I was a featured speaker at the annual conference for the International Municipal Lawyers Association.

24. In 2007, 2008, 2009, 2012 and 2013, I was a featured speaker at the Practising Law Institute's Annual Section 1983 Civil Rights Litigation program. My 2007 presentation in this program resulted in a law review article in the Touro Law Review (Volume 24, Number 3, pages 569-600) "Recent Developments in the Use of Excessive Force by Law Enforcement" Karen Blum/Jack Ryan. It is noted that my materials have been included in their annual publication related to this program.

25. In 2008 I was a featured speaker at the annual conference for the Association of American Law Schools, Civil Rights section, where I presented material on law enforcement policy, training, and generally accepted practices in pursuits and use of force.

26. In 2009 I was a featured speaker for the national conference for public risk managers.

8

**Ex. A - J. Ryan Report 00008**

27. In 2009 I conducted executive level training on law enforcement pursuit operations for the Utah Highway Patrol.

28. In 2009 I was certified with TASER by the Muncie Indiana Police Department by a TASER certified instructor.

29. In 2009, I was a featured speaker at the Annual Kentucky Tactical Officers' Association Conference where I lectured on high risk tasks in tactical operations including high risk entries.

30. In 2009 I was the featured speaker at the Alabama Attorney General's annual "Law Enforcement Summit" where I lectured on high risk critical tasks in law enforcement to include use of force, pursuit, arrest, search and care, custody and control of prisoners.

31. In 2010, I was a featured speaker at the annual national conference for PRIMA where I presented a law enforcement risk management program titled: "Promoting Professionalism while Reducing Liability; The Impact of Policy, Training, and Supervision and Auditing Strategies."

32. In 2010, I was a featured speaker at the National Internal Affairs Investigators Association annual conference held in Indianapolis, Indiana where I lectured on Bias Free Law Enforcement/Profiling.

33. In 2010, I was a featured speaker at the annual conference of the National Council of County Association Executives, where I spoke on law enforcement liability and strategies to reduce liability by increasing professionalism.

34. In 2012 I developed a training program for law enforcement and attorneys dealing with use of force; electronic control devices; and sudden custody death.

This program, which I am presenting throughout the United States is accompanied by a text manual which I wrote and is also being distributed nationwide.  As part of this program I have trained thousands of officers with respect to the expected and appropriate response in dealing with persons who have been injured or otherwise shown physical distress during the subdual process.

35. In 2012, I was a featured speaker at the National Internal Affairs Investigators Association Annual Conference where I spoke on Use of Force and Sudden In-Custody Death.

36. In 2012 I was a featured speaker at the Texas Commission of Law Enforcement Officers Standards and Education where I presented to law enforcement trainers from throughout the State of Texas on training liability and the need for training in the high risk critical tasks in law enforcement.

37. In 2013, I was a featured speaker and panel member in a program titled "Policing in Trying Times" at Suffolk University Law School in Boston Massachusetts.

38. In 2013, I was a featured speaker at "Police K-9" magazine's national Handler Instructor Training Seminar, an annual conference for K-9 handlers and trainers. This presentation focused on the law and best practices for use of law enforcement K-9s as a tool of apprehension.

39. In 2015, I was a featured speaker at the spring conference as well as the annual conference of the International Municipal Lawyer's Association.   The

10

presentation topic was officer involved shootings and qualified immunity post Plumhoff.

40. In 2015, I was a featured speaker for the annual conference of IADLEST, International Association of Directors of Law Enforcement Standards and Training.  My topics included "Training Liability" and "Emerging Liability Trends."

41. In 2015, I was a featured speaker at the Georgia Jail Association's Annual Conference in Savannah, Georgia where I presented topics relating to high-risk critical tasks in the jail operation.

42. In 2015, I was a featured speaker at the Arkansas Association of Chiefs of Police annual meeting where I presented materials on the Law and Best Practices for Policing in Trying Times.

43. In 2015, I was a featured speaker at the South Carolina Municipal Association's Annual Meeting for Elected Officials where I presented materials on Law Enforcement in Trying Times as well as covering issues related to law enforcement body cameras.

44. In 2015, I was a featured speaker for the Texas Commission on Law Enforcement where I provided training for 750 law enforcement trainers from throughout the State of Texas covering topics related to law enforcement liability and proper training.

45. In 2015, I was a featured speaker at the National Internal Affairs Investigators' Annual Conference where I presented training on emerging trends in law

enforcement liability and the interplay of the Internal Affairs process with agency liability.

46. In 2016, I was a featured speaker at the annual conference of the Defense Research Institute in Austin, Texas.

47. Since 2002, I have been involved in the auditing of law enforcement operations throughout the United States conducting several audits annually based on either a need or as a proactive measure of agency performance in the high liability areas of the road and jail operation. I have been involved in assisting dozens of departments nationally through these audits in developing policy, training, and enhancing operations for law enforcement services.

48. My experience, training and background are more fully described in the attached curriculum vitae, which I incorporate by reference to this report.

49. I have reviewed the following materials to date regarding this case:

1. Complaint
2. ASP Audio
3. ASP Photos
4. 911 Prior Calls and Reports
5. 911 Radio Log
6. Alexander PD Report-Maxheimer
7. ASCL Evidence Return
8. ASCL Submission
9. ASCL Receipt for Evidence
10. ASP Case Initiation
11. ASP Master Report
12. ASP Scene Diagram
13. ASP Scene Search
14. Interview Parker
15. Interview Buck
16. Interview Johnny Banks III
17. Interview Johnny Banks Jr.
18. Interview Kevin Cooper
19. Interview Randall Lippert

12

20. Interview Shelby Hawkins
21. Interview Vanessa   Banks
22. ASP Investigative Summary
23. ASP Photo Log
24. ASP Report on Disposition of Evidence
25. ASP Special Agent Notes-911
26. ASP Special Agent Note-BWC
27. ASP Special Agent Notes Front Door Diagram
28. ASP Special Agent Notes Lt.  Rhoads
29. ASP Special Agent Notes Parker Security Camera
30. ASP Special Agent Notes Previous 911 calls
31. ASP Special Agent Notes Shannon Hills Incident
32. Hawkins Interview MP4
33. Door Video MP4
34. Door Video 2 MP4
35. CLEST Attendance   Roster Shannon Hills
36. Buck Written Statement
37. Cooper Written Statement
38. Email from Rhoads re:  Radio Log
39. Finding Letter Prosecutor
40. Hawkins Drug Test Report
41. Hawkins Medical Papers
42. Inventory List
43. Johnny Banks II written statement
44. Letter from Prosecutor's Office 4-26-17
45. Maxheimer's BWV
46. Order of Protection Statistics Report
47. Parker Security Camera Footage
48. Shannon Hills Incident Report
49. Shelby Hawkins written statement
50. Vanessa Banks written statement
51. Walker Demand Letter
52. Deposition of Shelby Hawkins
53. Deposition of Johnny Banks

50. This expert report is based upon the materials provided to this date. The

   opinions presented in this report are based upon my specialized experience,

   training and knowledge of police practices as well as my continued research and

   work with law enforcement nationally. This work includes conducting training

   for law enforcement around the United States as well as auditing the policies

13

**Ex. A - J. Ryan Report 00013**

and operations of law enforcement agencies around the United States. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision. I am familiar with police civil litigation and know the normal phases of discovery. With this in mind I recognize that there may be additional documentation as the case progresses. In the event that additional material is produced I shall be prepared to supplement this report.

51. At the outset it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties.

52. The law enforcement event outlined in this affidavit involves the law enforcement response to a domestic violence call reported through 911 in Shannon Hills, Arkansas. The complainant, Vanessa Banks called 911 from 3023 Red Hawk Cove on February 17, 2017.

53. In the audio of the 911 call, a woman can be heard pleading with a man to leave. During the call contact was lost. The dispatcher broadcast, sending an officer to Red Hawk cove indicating that there was a disturbance and that she had lost contact with the caller. The dispatcher indicated that the phone was pinging at 3023 Red Hawk.

54. On the dispatch audio, the responding officer can be heard asking a second officer if he is free to respond and reported that there was a woman screaming inside. The officer also ran a plate that came back to Johnny Banks. In

14

addition, the officer can be heard letting dispatch know that he is going to have to force entry into the residence.

55. Officer Hawkins, the responding officer wrote: "On February 17. 2017 at approximately 9:30 p.m. I, (Officer S. Hawkins) was dispatched to the area of Red Hawk Cove for a physical disturbance and 911 hang up.  During this time Saline County Central advised me that they could only hear a female screaming at a male to leave and they couldn't get anyone to come to the phone.  While in route to the area Saline County advised me that they pinged the phone to 3023 Red Hawk Cove and they couldn't make contact back with anyone on that phone number.  Upon my arrival at Red Hawk Cove I noticed a Chevrolet pickup in the drive way on the side of the residence with its emergency hazard lights on. I then went to that side of the house to check the truck and make sure there was no one in the vehicles.  While standing between the White car in the driveway and the truck, I heard a terrifying female scream come from the residence.  I then advised for backup units to respond to the location (SHPD 311 and APD 204), during this   time I walked back to what appeared to the be the front of the residence and stood at the corner of the residence and listened to where the screams and yelling where (sic) coming from.  The screams and yelling were coming from inside the residence. I could hear a female screaming 'NO! NO! NO!  LEAVE!!' I then walked over to the front door of the residence and heard the female inside the residence scream again, NO! NO!  NO!,  this time  the screaming would  muffle and get  louder.  I requested for my backup units to 'step it up' and that I was going to make forced entry into the residence

15

into the residence due to the muffling of the females voice. I then waited   at the front door to give   my back   up units time to arrive before making entry into the residence.   I then heard the male yell something at the female, and the female yelled NO!! LEAVE!, then NO!  NO!  NO! again with muffling.     I then made approximately three attempts to get someone to come to the door by knocking and announcing, 'POLICE DEPARTMENT!, POLICE!' After the third attempt no one came to the door and the sounds inside the house remained the same. I decided I couldn't wait any longer due to the safety and the unknown threat to the female inside the residence. I   then checked to see if the door was unlocked, it would not open using the door knob. I, again announced 'POLICE'  to gain  the attention of the residents inside the house and started  to kick the bottom of  the door   knob, with my handgun in the low ready position. I had kicked the door approximately five times when the door violently swung open and I instantly lost my natural night vision because of the blinding lights coming from inside of the residence. I saw a dark, male silhouette standing approximately 1 ½ feet to 2 feet from me in a aggressive charging stance with his hand in a open fist outside the doorway.  I tucked my firearm closer to my body in low ready and stepped back with my right leg planted behind me in a defensive stance trying to protect my firearm from being grabbed and said 'Stop'.  I then felt a sharp pain in the top right of my head and went into a daze like I was going to pass out completely. Through the daze I looked up at the silhouette which appeared to be closer to me in the same aggressive stance. Feeling like my life and safety and the safety and lives of the other parties

16

involved were in danger, I fired my handgun from the low ready position one time. The silhouette walked back and laid down on the floor of what appeared to be the living room of the residence and yelled 'I've been shot.' A female voice came from a room off to the left 'saying you haven't been shot shut up.' That's when I radioed that I had one shot and needed medical assistance."  Officer Hawkins further reported   that he applied pressure to the subject's   wound while awaiting medical assistance. (Shannon Hills Incident Report).

56. It is noted that Vanessa Banks gave a statement in which she acknowledged a domestic dispute with her husband Johnny Banks.   Vanessa reported that she had received a letter indicating that Johnny was involved in an extramarital affair and had posted the letter on social media.  Vanessa stated that the dispute occurred when Johnny Banks came home from work.  Vanessa acknowledged calling 911 and indicated that she did not speak to the call-taker.  Vanessa reported that her and Johnny heard someone beating on the door and responded.  Vanessa said that when Johnny opened the door he was shot and that he never rushed the officer and never had anything in his hands.   (Vanessa Banks Statement).

57. Johnny Banks was also interviewed and acknowledged the domestic dispute with his wife over the accusatory letter she had posted on Facebook.  Banks reported that during the dispute there was banging that sounded as if someone was kicking or ramming the door.  Banks described that when he opened the door the officer shot him.  Banks   said that when he asked the officer why he had shot him, the officer responded by asking Banks why Banks had charged

17

him.  Banks reported that he tried explaining to the officer that he had not charged the officer.  Banks indicated that the officer, put pressure on his wound until relieved by a plainclothes officer.

Deposition of Shelby Hawkins

58. Officer Hawkins reported that he was dispatched alone to the call involving Mr. Banks at approximately 10:00 p.m. on February 17, 2017. (29).  Hawkins testified that he was the only patrol officer working on the shift at the time of this call. (29-30).  Hawkins said that the report from the dispatcher was that there was a disturbance and a 911 open line. (30).  The dispatcher reported hearing arguing through the open lie. (31). Officer Hawkins testified that he concluded that this was an emergency call based upon the fact that the dispatcher could hear a disturbance and was unable to get somebody to come on the open line. (34).

59. Officer Hawkins testified that he heard screaming in the residence before he entered. (41).  Hawkins indicated he heard the word "no" three times, with the first being loud, the middle being muffled like there was a hand placed over. The mouth, and the third being loud again. (46-47).  Hawkins also made observations of a Chevy Avalanche parked "kind of construed in the driveway, and it had its four-way hazard lights on, emergency lights." (54).  Hawkins also described hearing a loud noise that he could not identify. (58).

60. Hawkins described a combination or totality of factors that led him to believe there was an emergency in the house including, the initial 911 call reporting the disturbance, the manner in which the truck was parked, the 4-way emergency

18

**Ex. A - J. Ryan Report 00018**

lights on in the  truck, the loud  noise in the house,  and the no  ,no, no, with one being muffled  inside the house. (59).  Hawkins noted that the truck was parked on a slant so that it was blocking a car that was parked in front of the truck. (62).

61. Hawkins testified that the first time he knocked at the door it was about three times and he announced himself. (62-63). Hawkins said that he got no answer so he went to the left side again and listened at the window. (63).  Hawkins said that he could hear people but could not make out what was being said. (64).

62. Officer Hawkins said that he returned to the front door and, in addition to asking for backup, he began trying to kick in the front door. (70).   Hawkins said that as he kicked the door he was announcing "Police." (72).   Hawkins testified that Banks  opened  the  front  door,  Hawkins  was  struck  and  Hawkins  only  said: "Stop."  (73).     Hawkins  testified  that  although  he  had  called  for  backup  he determined  that  he  could  not  wait  because  he  believed  there  was  a  physical altercation  going  on  inside  the  house  based  upon  the  muffled  "no"s.   (80). Hawkins  described  that  as  he  was  kicking  the  door,  Banks,  from  inside  the house, opened the door. (82).

63. In describing the shooting, Hawkins testified: "So in the process of kicking the door, okay, the door come open.  I had my service pistol in a sul position, which is [low] ready. Okay. Just like I'm showing   you…Pointing down at the ground, which is load (sic) [low] ready, or sul, and the door come open.  When the door come open, we were within arm's reach. So I planted in a defensive to protect the firearm from either getting snatched out of my hand, or, you know, dropping it, whatever.  At that point in time is when I felt the sharp pain in my head and

19

was dizzy and the blinding lights from the door being opened from inside the residence.   Then I could see from here a silhouette of a person standing in the entry, like charging manner.  So I come back, and at this point I felt like that I was going to go down, as far as just from being struck in the head.  That's when I come up and saw him again, and it appeared that he was closer.   So that's when I fired my service pistol from low ready, and then that that point in time, he—the silhouette went into the house, and then that's when he went back in the light.  I could see him laying down. So from the doorway I could see it was his wife, I guess, was over here next  to the hallway area of  the residence, and so I made sure  that, you know, I could see his hands at this  point, you know, make sure the threat isn't going to re-present itself.  Then I holstered, made entry into the house, went down, kneeled down next to him, Mr. Banks, and then I started checking for injuries because of the bleeding that I already saw on the ground. At this point in time is when I saw him, or saw his wounds.  I called for an ambulance immediately, let them know not to standby, you know.  Then I asked the wife who behind me was telling him to shut up, he hadn't been shot.  And I told her he has been shot, I need you to go get me something to put pressure on it.  So at this point in time she comes back with tow or three towels.  And I'm putting pressure on him, and he's talking to me, asking if he can call his dad. And I said, I told him, No, we're not going to do that right yet. I need you to keep your blood pressure down, so you're not making the bleeding worse.  At this point in time my back-up officer come in, and because of my injuries I had him take over pressure, and I went back out to the yard." (86-88).

20

**Ex. A - J. Ryan Report 00020**

Training

64. Officer Hawkins testified that in addition to the basic police officer training, he also attended off campus fire academy classes. (Hawkins 8).  Hawkins attended the basic police academy in January of 2015. (Hawkins. 13).  Hawkins testified to training    he received in Shannon Hills reporting: "I took a 40-hour community-oriented policing training, and then our yearly, the yearly domestic violence that we're required, domestic violence.  The other one just slipped my mind.  Racial profiling, domestic violence, and use of force." (Hawkins 15).

_____

65. It is my opinion, based upon my specialized background, education, training, and experience as well as my continued research, authoring, auditing, consulting, and training on law   enforcement practices nationwide   that the actions of Officer   Hawkins in approaching this 911 call and the decision to make  a force entry into the residence were  consistent with generally accepted policy, practices,   training,   and legal   mandates trained   to   officers for application in  field  operations.

66. Over the last three decades law enforcement has recognized the danger as well as the need for an immediate response to incidents of domestic violence. As part of this training, officers are taught the need for immediate intervention and arrest where facts and circumstances support a belief that   a crime has or is occurring.   There is no dispute, based on the materials provided to date that includes the 911 audio, that Hawkins was responding to a domestic disturbance. Upon arrival at the scene, which was determined by the communications center

21

pinging the phone, Hawkins made a number of visual and audio observations corroborating this domestic disturbance and consistent with a threat to a victim in the residence.   These observations included  a truck with  the flashers  on parked  diagonally  in  the  driveway,  an  unidentified  noise  in  the  house,  a terrifying  scream coming from  the  house, a  woman  pleading  with a  man who   was yelling back at the  woman, a muffling of  the woman's voice that may be indicative  of an assault to stop the screaming, and a lack of response to a knock and announce at the door. (See also Hawkins Deposition 109).

67. Any reasonable and well-trained officer would conclude, based on the totality of these  facts  that  a  domestic  assault  was  in  progress  based  upon  generally accepted law enforcement policy, practice, and training.

68. Any reasonable and well-trained officer would conclude that immediate action, to  include  a  force  entry  to  stop  this  potential  assault  in  progress,  would  be consistent with generally accepted policy, practices, training, and legal mandates trained to officers for application in field operations.

69. At the outset I would note, that just as in the use of force setting, all officers are trained  that  their  actions  will  be  judged  based  upon  the  officer's  reasonable perception of what was occurring at the time the enforcement action was taken and not based upon what was learned with 20/20 hindsight.  The facts known to Hawkins at the time included: the 911 audio, and a number of visual and audio observations  made  by  Hawkins  when  he  arrived  which  corroborated  this domestic disturbance and consistent with a threat to a victim in the residence. These observations included  a truck with  the flashers  on parked diagonally in

22

the driveway, an unknown noise coming from inside the house, a repeated "no" coming from the house, a woman pleading with a man who was yelling back at the woman, a muffling of the woman's voice that may be indicative of an assault to stop the screaming, and a lack of response to a knock and announce at the door.

70. All officers are trained that one of the justifications for making a forced entry into a home is exigent circumstances. Training to officers around the United States indicates: Law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. This emergency aid exception does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises. It requires only an objectively reasonable basis for believing, that a person within the house is in need of immediate aid. Officers are also trained that an exigent entry may be justified if the officer has an objectively reasonable basis for fearing that violence is imminent within the residence. Additionally, the training also includes the directive that law enforcement officer may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such an injury. I would note that this universal training has its genesis in decisions promulgated by the United States Supreme Court which have been incorporated in law enforcement policy and training.

71. Clearly, based on the totality of facts known to Hawkins at the time of his decision to make entry, including the 911 audio as well as the visual and audio

23

observations made by Hawkins when he arrived at the scene which corroborated this domestic disturbance and consistent with a threat to a victim in the residence any reasonable and well-trained officer would have concluded that a decision to enter was consistent with generally accepted policies, practices, training, and legal mandates trained to officers for application in field operations. As note these additional observations included a truck with the flashers on parked diagonally in the driveway, a woman pleading with a man, repeatedly saying "no" while the man was yelling back at the woman, a muffling of the woman's voice that may be indicative of an assault to stop the screaming, and a lack of response to a knock and announce at the door.

72. It is my opinion, based upon my specialized background, education, training, and experience as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that the use of deadly force by Officer Hawkins consistent with generally accepted policy, practices, training, and legal mandates trained to officers for application in field operations.

73. As noted, any use of force by an officer is judged by the facts and circumstances known to the officer at the time the force was used and not with the benefit of 20/20 hindsight. Thus all law enforcement policy and training indicates that an officer's use of force decision will be consistent with generally accepted policy, practice, and training where the officer has an objectively reasonable perception that such force was necessary irrespective of whether such force was actually necessary.

24

74. The facts known to Hawkins included:  Officer  Hawkins  was responding  to a dispatched  domestic  violence  call  in  which  the  complainant   could  not  be contacted; Hawkins noted a vehicle with the flashers on outside the residence; Hawkins heard  a  scream  and pleading of  female in the  residence; Hawkins heard  a male  also yelling in  the  residence; Hawkins was by himself  at nighttime; Hawkins noted no response to his knock and announcement; Hawkins noted the door suddenly  open  with  what he perceived to be  an aggressive subject in the doorway; and  Hawkins felt a  strike to his head that dazed him in a manner that led him to believe he may lose consciousness. Any reasonable and well  trained officer, based on common law enforcement training, confronted with this  set of  circumstances, would  reasonably perceive  that he or she was facing  an immediate  threat of serious bodily harm or death and that anyone else in the area, including the domestic  violence  victim was facing a  similar  threat and that a use of deadly force would be consistent with  generally accepted law enforcement policy,  practice, training, and legal mandates  trained to officers for application in field operations.

75. Officers throughout the United States are trained in two formulas with respect to use of force decision-making and justification.  The first of these formulas is a three-part test that parallels the mandates announced by the United States Supreme Court in *Graham v. Connor.*[1]  The training directs officers to consider the seriousness of offense; whether or not the subject poses an immediate

---

[1] This formula is derived from *Graham v. Connor,* 490 U.S. 386 (1989) and can be found in law enforcement training lesson plans as well as Use of Force policies throughout the United States.  See e.g. International Association of Chiefs of Police, Use of Force Model Policy 2005, IACP Model Policy Center, Virginia 2005.

Ex. A - J. Ryan Report 00025

physical threat to the officer or anyone else; and finally whether the subject is actively resisting or attempting to evade arrest by flight.

76. Officers throughout the United States are trained with respect to the danger of going hands on with a violent subject.  It is recognized that close-quarter, hands on conduct with a violent an unpredictable subject brings the officer's weapon within the reach of the subject and increases the level of danger to anyone in the area of the event.[2]  Officers are also aware that a single officer is subject to an even greater threat due to the lack of assistance by other officers.

77. Here, Officer Hawkins was aware of all of the previous cited totality of facts as well as the fact that he was facing a subject at the doorway and that he had been struck in the head and felt that he was dazed and may lose consciousness. All officers are trained that when faced with this type of threat where the subject will have access to the weapon of an officer who is incapacitated, then the officer's use of deadly force is consistent with generally accepted policies, practices, training, and legal mandates trained to officers for application field operations.

78. It is recognized that when considering the seriousness of the offense; that such consideration includes the offense the officer suspects at the time the control tactic is used and not just the original offense or other justification which led the officer to contact the individual at the outset.  Here, the seriousness of the offense as perceived by Hawkins would be a violent domestic assault and the beginning of a violent assault upon an officer.

---

[2] See, IACP "Use of Force" Concept Paper: "Statistics on police officers killed feloniously over more than a decade reveal that about 15 percent of police homicides were perpetrated by assailants using the officer's own handgun."

79. The second formula was commonly referred to as the "Use of Force Continuum."  While agencies utilize different force continuum models, all of the models recognize that officers have various subject control tactics available to them and that these tactics range from a low-level intrusion, such as officer presence and verbal commands, to the highest level, which is deadly force. It should be recognized that even in those agencies that still use a force continuum, the continuum is not a ladder that must be climbed step by step.  Instead it is a presentation of various force options, each of which must be objectively reasonable under the circumstances with which the officer is faced.  It is noted that due to confusion over application of such continuums, law enforcement is moving away from this concept and simply train "force options."   It is recognized that many law enforcement agencies are moving away from the so-called "continuum" and moving toward a "Graham" decision-making model.

80. It is well known in law enforcement that officers are often forced to make split-second judgments in circumstances that are tense, uncertain and rapidly evolving, about the amount of force that is necessary in a particular situation. It is well understood in law enforcement that the use of force must be judged from the perspective of the officer on the scene, taking into account what the officer reasonably believed to be the circumstances at the time and not with 20/20 hindsight.   As described by Hawkins as well as Vanessa and Johnny Banks, the confrontation at the doorway was this very type of split-second decision-making, contemplated by use of force analysis.

27

**Ex. A - J. Ryan Report 00027**

81. It is well known that an officer reasonably perceives an immediate threat of serious bodily harm or death against themselves, another officer, or any third party, the officer may respond with deadly force.  A fundamental principle of officer survival and use of force is the fact that action beats reaction every time.[3] Common defensive tactics programs offered to law enforcement as well as law enforcement related texts indicate that even a subject running from an officer can turn and fire two shots before the officer would be able to react.[4]  It is well known in law enforcement that the physical lag time between an officer's perception of a threat and the response to the threat in many cases will put the suspect in a different position. The concept is well known in law enforcement and is consistent the Military's OODA Loop training which reflects that a person must first Observe the threat, then Orient to the threat, then Decide what action to take, and finally must Act.[5]  It is well recognized that a threat can be carried out or positions will be changed during the time it takes an officer to cycle through this process.  Hawkins immediate response to a perceived threat of serious bodily harm or death was consistent with generally accepted policies, practices, training, and legal mandates trained to officers for application in field operations.

82. When an officer is confronted with an immediate threat of serious bodily harm or death the trained response is the use of deadly force to stop the threat.  Other options while of course reasonable, are discouraged due to the fact that if such

---

[3] See e.g. <u>Deadly Force Constitutional Standards, Federal Policy Guidelines, and Officer Survival,</u>  John Michael Callahan, Jr. Looseleaf Publications, Flushing, N.Y. 2001
[4] See e.g. Deadly Force Constitutional Standards, Federal Policy Guidelines, and Officer Survival,  John Michael Callahan, Jr. Looseleaf Publications, Flushing, N.Y. 2001
[5] OODA Loop Model was first developed by Colonel John Boyd USAF during the Korean war.

28

less-lethal options are unsuccessful, the officer will be unable to transition to deadly force before the threat is carried out by the subject.    Under the undisputed facts, Officer Hawkins was by himself at this location and although he had called for backup, perceived that the exigency of the situation did not allow him to wait for the arrival of backup.    The deployment of less-lethal options such as a TASER or baton would not be indicated under these circumstances due to the fact that there is no lethal-cover officer available and a decision to use less-lethal would deprive the solo officer from protecting himself or others from a lethal threat that presents itself.

83. I would note that Hawkins' immediate response in rendering aid to Mr. Banks as described by Banks was consistent with the best practices in law enforcement.

84. I would also note that while the complaint alleges deficiencies on the part of the City of Shannon Hills, I found no evidence in the materials provided to date to support such an allegation.

85. In fact, it  is my opinion, based upon the materials  presented and my specialized background, education, experience, and   training as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that the actions of the Shannon Hills Police Department is consistent with   generally accepted policies and training in law enforcement nationwide.

86. Officer Hawkins testified to significant training including specialized training in areas implicated by this case including domestic violence and use of force

29

annual training. (Hawkins. 14-15). Hawkins testified that he was trained on using various force options in line with a force continuum. (Hawkins 25-26).

87. At this stage of my review I do not know if I may be asked to review additional documents.  Should I be asked to review any additional documents I will be prepared to render additional opinions or supplement the opinions stated within this report.

88. At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such tool; I will assure that they are made available for review, if requested, prior to their use.

    This affidavit is signed under penalty of perjury on this 17th day of June 2019, in Greenville, R.I.


             *s/John J. Ryan*
             John J. Ryan

30

**Ex. A - J. Ryan Report 00030**