UNITED STATES DISTRICT COURT

FOR THE

EASTERN DIVISION OF ARKANSAS


JOHNNY BANKS                                              PLAINTIFF


v.


Civil Action No. 4:18cv-259BSM


SHELBY HAWKINS et al.                                    DEFENDANTS


DEPOSITION OF:


JOHN J. RYAN


(Taken July 29th, 2019, at 8:57 a.m.)


BUSHMAN COURT REPORTING (501) 372-5115

**Ex. B - Dep. of J. Ryan 00001**

1   history from the Rhode Island judiciary.

2   A     No.

3   Q     Okay.  I want to talk about your experience as

4   a lawyer.  I looked in your Schedule A.  There's

5   nothing in here about actually practicing law.

6   A     Right.

7   Q     Have you ever practiced law?

8   A     You know, I've done probably two cases.  I did

9   a case early on.

10  Q     "Early on" being when, time frame?

11  A     I want to say 1995, January 1995.  I had a --

12  I don't know if you know what a Police Explorer is,

13  but the Boy Scouts have a program where young people

14  can work in the police station --

15  Q     Okay.

16  A     -- as volunteers.  And a Police Explorer and

17  his family was having legal trouble and I intervened

18  in their behalf.  I got a default judgment against

19  them thrown out.  I then took the case to trial and

20  got a verdict in their favor.  The other side

21  appealed.

22        And at the end of the day, there was the

23  contractor who the judgment I got against went

24  bankrupt, and so there was really no money.  And his

25  lawyer actually wrote a check for a very small

BUSHMAN COURT REPORTING (501) 372-5115

**Ex. B - Dep. of J. Ryan 00002**

1    amount to the family to just get rid of the case.

2    He wanted it off his books, so he wrote a check, I

3    think, for $500, when their damages were much more

4    than that.  It was a faulty roof issue and the

5    contractor had fallen off the roof.  It was a messy,

6    messy case.

7         But anyway, the bottom line is that's the only

8    case that I ever tried.  I did enter an appearance

9    maybe three years ago on a probate case.  A friend

10   of mine had an uncle that died and I was trying to

11   save him some money and help him out because he

12   didn't have much money, and so I entered an

13   appearance on that.

14        But I referred that to somebody else now

15   because he was not very cooperative as the executor

16   of that estate, so I decided that rather than blow

17   the friendship, I'd refer the case to somebody else.

18   So my name's off it and a friend of mine who I went

19   to law school with is on it now.

20   Q       In what court was that 1995 case litigated?

21   A       It was first litigated on the motion calendar

22   to get the default judgment removed in superior

23   court, which is our midtier court.

24   Q       And you -- and by "we," are you meaning the

25   State of Rhode Island?

                BUSHMAN COURT REPORTING (501) 372-5115

**Ex. B - Dep. of J. Ryan 00003**

```
 1   agreeable to the family, and that was the end of the
 2   case.
 3   Q     Have you ever argued a case on appeal?
 4   A     I have not.
 5   Q     Have you ever written an appellate brief?
 6   A     I have not.  I --
 7   Q     Have you --
 8   A     -- I've weighed in on a couple for -- for
 9   various people, but I've never actually read one.
10   Q     And have you ever tried a case before a jury?
11   A     No.
12   Q     Now, in this 1995 case, were you the sole
13   attorney representing your client?
14   A     Yes.
15   Q     And what kind of pleadings did you draft in
16   that case?
17   A     I don't have -- I don't have any memory.  I
18   know I -- I know I had to file a motion to remove
19   the default judgment.  I -- I don't -- I don't
20   recall what -- what exactly I did.  And then I had
21   to argue it at the motion calendar.
22   Q     Okay.  Did you take any depositions in that
23   case?
24   A     No.
25   Q     Have you ever taken a deposition?
```

BUSHMAN COURT REPORTING (501) 372-5115

**Ex. B - Dep. of J. Ryan 00004**

1   A       No.

2   Q       Okay.  Did you file a motion in limine?

3   A       No, no motion in limine filed in that case.

4   Q       And do you know what a motion in limine is?

5   A       Of course.

6   Q       Okay.  Tell me what your understanding of what

7   a motion in limine is.

8   A       It's to exclude certain maybe issues, maybe

9   information, and maybe even witness testimony.

10   Q      All right.  Now, on June 28, 1993, the Supreme

11   Court of the United States decided a case, the first

12   name of it has been -- has multiple names, so I

13   won't give -- I'll just spell it.  You'll be

14   familiar with it -- at least I'll find out.

15          D-A-U-B-E-R-T *versus Merrell Dow*

16   *Pharmaceuticals, Incorporated,* are you familiar with

17   that case?

18   A       With *Daubert*?  Sure.

19   Q       Have you read that case in its entirety?

20   A       I have over the years.  I haven't read it

21   recently.

22   Q       Do you recall the last time you read that case

23   in its entirety?

24   A       No, I don't.

25   Q       Are you familiar with the follow-on case

               BUSHMAN COURT REPORTING (501) 372-5115

```
 1  BY MR. CAIN:
 2  Q     -- do you take issue with that?
 3            MS. MONAGHAN:  Same objection.
 4  A     No.  Some judges allow me to, some don't.
 5  That's not unusual.
 6  BY MR. CAIN:
 7  Q     Are you familiar with Federal Rule of Evidence
 8  702?
 9  A     Sure.
10  Q     Can you te --
11  A     I don't -- I don't know it by heart.
12  Q     Okay.  Can you tell me what your understanding
13  of Rule 702 is?
14  A     702 would be on expert testimony.
15  Q     Anything else that you can --
16  A     I don't remember.
17  Q     Okay.  Can you tell me what the four factors,
18  reliability factors the Supreme Court articulated in
19  Daubert?
20            MS. MONAGHAN:  Object to the form.
21  A     I don't -- I don't have that committed to
22  memory.  I'm not here as a lawyer to give legal
23  opinions.
24  BY MR. CAIN:
25  Q     Now, did you -- do you recall being retained
```

**Ex. B - Dep. of J. Ryan 00006**

1    Q      I didn't hear you.

2    A      Of course.

3    Q      Okay.  And so if a primary source of law

4    either requires an affirmative act or prohibits

5    something, you've had two courts who here have said

6    you can't offer an opinion with respect to that;

7    right?

8    A      I can't offer an opinion with respect to what

9    the legal mandate is.

10   Q      Okay.

11   A      I can offer an opinion as to what the

12   generally accepted policy, practice, and training is

13   and the legal mandate as trained to officers for

14   application in field operations.  And I think if you

15   go back and read that sentence you read in *Provost*,

16   it makes it pretty clear.

17   Q      I want to turn to a third case in the United

18   States District Court, Northern District of

19   Illinois, *Rodell*, R-O-D-E-L-L, *Sanders versus City*

20   *of Chicago Heights.*  Do you recall participating in

21   that case as an expert?

22   A      Yes.

23   Q      And there, you were retrained by whom?

24   A      I was retained by the defense.

25   Q      Now, the Court there was Amy J. St. Eve,

1  understand how the officer's training applies to
2  this particular case and why an officer would make
3  the decision under these circumstances that an entry
4  was justified under training and policy, not under
5  the law.
6  Q     But my question, Mr. Ryan, is and was:  Does a
7  jury need to hear you tell it what the law is?
8  A     Not the law.  The judge tells them the law.
9  Q     Okay.
10 A     That's the judge's job.
11 Q     Does a jury need you to tell it whether
12 something is objectively reasonable within the
13 meaning of the Fourth Amendment?
14 A     No.  Ultimately, that's up to -- to the -- you
15 know, the jury to decide whether something's
16 objectively reasonable or not.
17 Q     Does a jury need to te -- you to tell it
18 what -- whether an exigent circumstance existed in a
19 particular case?
20 A     No.  They need me to tell them what officers
21 are trained with respect to exigent circumstances,
22 what the policies are with respect to exigent
23 circumstances, so they have an understanding of
24 whether or not -- what the officers are trained and
25 whether this officer acted consistent with policy

Ex. B - Dep. of J. Ryan 00008

1        to --

2              MR. WALKER:   Thank you.

3              MS. MONAGHAN:   -- concluding.

4              MR. WALKER:   Thank you.

5    BY MR. CAIN:

6    Q     Mr. Ryan, you ever tried a case to verdict?

7    A     No -- well, yes.   I mean, I tried that case

8    that I told you about at the beginning.

9    Q     You never tried a case to a jury?

10   A     No.

11   Q     You've never taken a deposition?

12   A     True.

13   Q     You never litigated a case in the United

14   States District Court?

15   A     That's true.

16   Q     You never litigated a case in the United

17   States Circuit Court?

18   A     True.

19   Q     Never litigated a case in the Supreme Court of

20   the United States?

21   A     True.

22   Q     Never litigated a case in the Court of Final

23   Jurisdiction in the state of Rhode Island?

24   A     True.

25   Q     You've never taken a deposition?

               BUSHMAN COURT REPORTING (501) 372-5115

 1   A     True, again.

 2   Q     Would it even be fair to consider you a

 3   practicing lawyer?

 4   A     Oh, no, I don't think it's fair to consider me

 5   a practicing lawyer.

 6   Q     All right.  Now, paragraph 84, page 29 of your

 7   report, you opine that there are -- you find no

 8   evidence of there being deficiencies in the City of

 9   Shannon Hills Police Department; correct?

10   A     Correct.

11   Q     Now, you opined before about deficiency, or

12   the lack thereof, in the Chicago Heights Police

13   Department; right?

14   A     That was different.  That was on corruption

15   and there was discovery on corruption.  There was

16   discovery on corruption.  And -- and the judge said

17   that I hadn't made the connection between the

18   corruption and the actual case -- or I said there

19   was no connection -- and that she wasn't going to

20   let me testify to causation.  I think that's what

21   the issue was.

22         I'm certainly well aware -- you know, one of

23   the things that you may not know but it's on my CV

24   is that I train lawyers all over the country for

25   Section 1983 actions.  So I think I've got a little

```
 1   Q      As an adjunct?
 2   A      No, no.  It's -- I'm invited in by Karen Blum,
 3   who's probably the top academic in Section 1983 in
 4   the country.
 5   Q      All right.  Now, I want to talk about your fee
 6   schedule here.  When -- why did you leave the -- how
 7   old are you now?
 8   A      I am 58.  Sorry.  I had to think about it.
 9   Q      And when you left law enforcement, was that
10   voluntary?
11   A      Absolutely.
12   Q      And what were -- what were you earning per
13   year when you -- at -- at the highest earning point
14   during your career as a law enforcement officer?
15   A      With overtime and whatnot, probably about
16   110,000, something like that.
17   Q      Okay.  And what do you earn annually in
18   connection with -- at the highest point, in
19   connection with Legal & Liability Risk Management
20   Institute?
21   A      For everything that I do, probably -- at the
22   end of the day, probably a little over $400,000.
23   Q      Now, your fee schedule here says that you
24   charge a flat fee for this case of $8,500.  How'd
25   you arrive at that amount?
```

Ex. B - Dep. of J. Ryan 00011

```
 1  A      That's not my amount, that's what the Legal &
 2  Liability Risk Management Institute charges.
 3  Q      Okay.
 4  A      I get -- I get about 6,000 of that.  So what I
 5  did was I figured it out on an hourly basis that
 6  would -- that -- usually, I put somewhere between 30
 7  and 40 hours into a case, so it's somewhere between
 8  150 and 200 an hour.  But that way, I don't have to
 9  keep hours.
10  Q      Did you -- so you didn't start -- you didn't
11  start legal -- Legal & Liability Risk Management
12  Institute?
13  A      Actually, a group of us started the company.
14  Q      That's what I thought.
15  A      But not -- not for purposes of litigation
16  consultation, it was more for purposes of writing
17  policies nationally, doing audits nationally, those
18  kinds of things.  And then the litigation just
19  became part of it.
20  Q      So are you an employee of this institute or --
21  A      Independent contractor.
22  Q      Okay.  And you work out of your home in Rhode
23  Island?
24  A      I do.  Actually, I work out of a suitcase.  I
25  average about 200 hotel room nights a year.
```

**Ex. B - Dep. of J. Ryan 00012**